## UNITED STATES v. RAILWAY EMPLOYEES' DEPARTMENT OF AMERI-CAN FEDERATION OF LABOR et al.

(District Court, N. D. Illinois, E. D.   September 23, 1922.)

No. 2943.

1. Monopolies ☞24(1)—United States ☞126—United States may maintain bill to enjoin unlawful conspiracy among strikers in restraint of trade.

The United States may maintain a bill in the public interest to enjoin an unlawful conspiracy or combination in restraint of trade among striking railway employees, both under its general equity jurisdiction and under Sherman Act, §§ 1, 4 (Comp. St. §§ 8820, 8823).

2. Monopolies ☞12(2)—Statute prohibits combination of either labor or capital to secure action essentially obstructing free flow of commerce.

The Sherman Act (Comp. St. §§ 8820–8823, 8827–8830) prohibits any combination whatever, whether of labor or capital, to secure action which essentially obstructs the free flow of commerce between the states.

3. Injunction ☞101(2)—One relying on statute relative to labor disputes must bring himself within all the limitations contained in the statute.

One relying on the exception to the power of a federal court of equity to give injunctive relief under general principles of equity jurisdiction, created by Clayton Act, § 20 (Comp. St. § 1243d), relative to cases between employers and employees, etc., must bring himself within all the limitations by which the exception is hedged about.

4. Injunction ☞101(2)—Monopolies ☞24(1)—Suit by government not within statute as to injunctions in labor disputes.

Clayton Act, § 20 (Comp. St. § 1243d), prohibiting injunctions in cases between employers and employees, etc., involving or growing out of a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury, etc., and providing that no such restraining order or injunction shall prohibit certain acts, does not apply to a suit by the United States in the public interest to enjoin an unlawful conspiracy or combination in restraint of trade.

5. Injunction ☞101(2)—Statute does not legalize acts in labor dispute, when done in furtherance of conspiracy.

Clayton Act, § 20 (Comp. St. § 1243d), providing that no restraining order or injunction in a case between an employer and employees, etc., shall prohibit any person from terminating any relation of employment, ceasing to work, persuading others to do so, etc., and that such acts shall not be considered violations of any federal law, does not make the acts specified immune from punishment, when done in furtherance of an unlawful or criminal conspiracy.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**6. Monopolies ⬩12(I)—When purpose of combination is to restrain trade, it may not be carried out, even by means otherwise lawful.**

If the dominating primary purpose of a combination is to restrain trade, or do things unlawful in themselves, and which by reason of their inherent nature operate to restrain trade, such purpose is unlawful, and may not be carried out, even by means that otherwise would be lawful.

**7. Monopolies ⬩24(2)—In determining purpose of combination, acts to be taken in relation to each other, and natural consequences of acts presumed intended.**

In determining, on proof necessarily largely circumstantial, whether the primary controlling purpose of a combination of strikers is the obstruction of interstate commerce, acts must be taken in their relation to each other, and men must be presumed to intend the natural consequences of their acts, and proclamations of nonparticipation and exhortations to keep the peace cannot relieve from responsibility for a series of acts so nearly related and interwoven as to show on their face design and plan.

**8. Conspiracy ⬩13—Persons at head of strike held responsible for unlawful acts committed in its conduct.**

Where, following the calling of a strike of railroad shopmen, a series of depredations on railroad property began, accompanied by destruction and injury to such property, sabotage was practiced on an enlarged scale, and employees were insulted, assaulted, and otherwise intimidated, and such unlawful acts were on such a large scale and so connected in point of time and place with the admitted conduct of the strike as to admit of no other view than that they were done in furtherance of a common purpose and as part of a common plan but the leaders of the strike continued to urge members of their organizations to greater activity, they are charged with knowledge of the things being done as the direct result of the methods by which the strike was being conducted, and cannot deny responsibility for such acts.

**9. Notice ⬩6—Notice of acts which could be learned by inquiry presumed.**

In criminal as well as in civil affairs, every man is presumed to know everything that he can learn on inquiry, when he has facts in his possession which suggest inquiry.

**10. Constitutional law ⬩½, New, vol. 4 Key-No. Series—Constitutional rights must be exercised with reasonable regard for conflicting rights of others.**

Rights guaranteed by the Constitution are not so absolute that they may be exercised under all circumstances, and without any qualification, but, like other rights, must always be exercised with reasonable regard for the conflicting rights of others.

**II. Injunction ⬩189—Peaceable and lawful acts in conduct of strike enjoined, when interwoven with plan of intimidation and obstruction.**

Where peaceable and lawful acts in the conduct of a strike of railway employees are so interwoven with the whole plan of intimidation and obstruction that to enjoin only assaults and other acts of violence, leaving defendants free to pursue the open and ostensibly peaceful part of their program would be an idle ceremony, such acts will likewise be enjoined.

**12. Monopolies ⬩12(2)—Restraint of trade not proper weapon of industrial warfare.**

As against the public, restraint of trade may not be adopted as a weapon in industrial warfare.

**13. Injunction ⬩137(I)—Monopolies ⬩24(2)—Settlement of strike before hearing on application for temporary injunction not ground for denial.**

That a strike of railway shopmen has been settled on some railroads after the bringing of a suit by the government to enjoin a conspiracy in restraint of trade, and before the hearing of an application for a temporary injunction, does not defeat the right to relief, which is to be determined by the status existing at the time of the filing of the bill.

In Equity. Suit brought by the United States against the Railway Employees' Department of the American Federation of Labor and

---

⬩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

others, under the general equity jurisdiction of the United States District Courts and under the act entitled "An act to protect trade and commerce against unlawful restraints and monopolies," approved July 2, 1890 (26 Stat. 209 [Comp. St. §§ 8820–8823, 8827–8830]), to restrain and enjoin the defendants as an unlawful combination and conspiracy to interfere with, hinder, obstruct, and restrain interstate trade and commerce, and the carriage of the United States mail upon and over the lines of railroad and systems of transportation of the United States. On hearing of motion of the Unitel States for a preliminary injunction. Preliminary injunction granted.

The case presented by the bill is this: The United States, finding that the interstate transportation of persons and property, as well as the carriage of mails, is obstructed and threatened with destruction, and that a combination and conspiracy exists to subject the control of such transportation to the will of the conspirators, applies to this court for an injunction to prevent such obstruction and to prevent carrying into effect such conspiracy. The application is made under both the general equity jurisdiction to aid the government in preventing interference with interstate commerce and the mails, and the provisions of the Acts of July 2, 1890, c. 647, 26 Stat. 209, and October·15, 1914, c. 323, 38 Stat. 730, directed against unlawful restraints and monopolies.

The bill names as defendants Railway Employees' Department of the American Federation of Labor, International Brotherhood of Blacksmiths, International Alliance of Amalgamated Sheet Metal Workers, International Brotherhood of Boiler Makers, Iron Shipbuilders and Helpers of America, Brotherhood of Railway Carmen of America, International Association of Machinists, and International Brotherhood of Electrical Workers, all of which are voluntary labor organizations, and the last six of which are known as the federated shop crafts comprising a division of the American Federation of Labor, numerous branches of said federated shop crafts throughout the United States which are known as system federations, Bert M. Jewell, John Scott, and other individuals, who are also sued as members of the executive council of the railway department of the American Federation of Labor. The bill states in substance that:

Prior to July 1, 1922, the entire membership of said federated shop crafts were in the regular employment of the railway companies operating throughout the United States. Two million employees are in the service of said railway companies, of which 490,000 are shop employees, including 400,000 members of said federated shop crafts. The work of said shop employees in inspecting, overhauling, and repairing rolling stock and equipment in the shops is essential to the operation of the railways, and must be done by skilled and experienced mechanics. If the work at the shops is prevented, the resulting deterioration of rolling stock and equipment will impair and very shortly destroy railway service, thereby obstructing interstate commerce. The Transportation Act of 1920 contains provisions which are set forth concerning disputes between carriers and their employees. 41 Stat., pp. 469–474.

In the case of Alabama & Vicksburg Railway Company v. Railway Employees' Department, American Federation of Labor, et al., the Labor Board of June 5, 1922, decided a dispute between the railway carriers of the United States and their employees, members of said federated shop crafts, concerning wages and conditions of employment. It was the duty, the bill charges, of both parties to the dispute to observe the order of the Labor Board. Such obligations rested upon both the public service corporations and their employees because of the direct connection of the service rendered with interstate transportation. The public has an interest in the orderly observance of the rulings of the board, and public injury results from a disregard of such rulings. The United States has a legal right to prevent an interruption of interstate transportation growing out of a failure to observe those rulings and a resort to strikes to overthrow them. The defendants, dissatisfied with said rulings of the Labor Board, entered into a combination and conspiracy to disregard it, and to quit the service of the railway companies in a body at one and the same time as a protest against and contempt for said decision of the Labor Board

of the government of the United States. The purpose of said strike was to compel the railway companies, through public pressure, to disregard the decision of the board, by making it impossible for them to discharge their functions and obligations.

On June 29, 1922, a strike order was promulgated, requiring the members of the federated shop crafts to quit in a body on July 1, 1922, and to absent themselves from their employment until the companies should repudiate the order of the board and pay the scale of wages demanded by the union. On July 1, 1922, about 90 per cent. of the members of the federated shop crafts abandoned the service of the railway companies, thus purposely impairing the safety and efficiency of the entire transportation system of the United States, and compelling the railway companies, in many instances, to abandon the operation of passenger and freight trains, with consequent inability and incapacity to carry the mails and transport in interstate and foreign commerce food, fuel, and other necessaries and supplies for the immediate needs of the public, particularly in the large cities, the transportation of all of which has been and now is retarded, restrained, and obstructed, and is seriously in danger of being utterly prevented. The Interstate Commerce Acts, the Safety Appliance Acts, and the Live Stock Transportation Act impose many public duties upon the railway companies with respect to the continuous operation of the railroads, the maintenance of rolling stock and equipment and the transportation of live stock. Said railway companies also have public duties with reference to the carriage of mails and the transportation of military forces and supplies and equipment therefor.

The railway systems are an integral part of the industrial life of the country, and their continued operation is now essential to the distribution of food and the maintenance of industries, without which the nation cannot exist. Bituminous coal is absolutely necessary, not only for industrial purposes, but to preserve the lives of the people in many parts of the country. There is an acute coal shortage, resulting from the complete suspension of mining operations since April 1, 1922. If the transportation systems are now broken down, a national disaster will result, and the people will be utterly unprovided with fuel and food in the face of winter.

Simultaneous and concerted abandonment of the service of the railway companies by the members of the federated shop crafts necessarily impairs the efficiency of the entire railway transportation system, and operates to obstruct interstate commerce and the carriage of the mails. To remove such obstruction, and to save the entire railway system from complete breakdown, new employees in equal numbers must be placed immediately in the service and trained. The railway companies are now engaged in filling the places of the members of the federated shop crafts who left their service with a like kind of employees, or as nearly as may be. While some interference with interstate commerce and the carriage of the mails must necessarily result, the railway companies will be able to restore the service and to perform their public duties, unless they are prevented from obtaining the necessary employees by the acts of the defendants.

Well knowing the facts above set forth, the defendants engaged in a combination and conspiracy to hinder and prevent the railway companies from obtaining the services of other necessary workmen, and to prevent such other workmen from entering the services of the railway companies, and to cause members of the federated shop crafts who have continued in the service of the companies to abandon the service, and to wholly deprive the railway companies of the forces and facilities with which to maintain their rolling stock and equipment, and thus to obstruct the transportation of passengers and property in interstate commerce and the carriage of the mails. In pursuance of said conspiracy the individual defendants, comprising the executive council of the railway employees' department of the American Federation of Labor, published and circulated, among the members of said federated shop crafts, letters and other communications directing the officers and members of said federated shop crafts to picket the shops and other premises of the railway companies, and to prevent the railway companies from securing and having sufficient number of employees to keep the rolling stock and equipment in repair and to maintain the same in proper running order.

The defendants have carried out the purpose of said conspiracy by unlawful means, including picketing, displays of force, acts of violence, and the infliction of personal injuries upon officers and employees of the railway companies, and by such unlawful means and other acts of terrorism, as well as by inducement, argument, and persuasion, have sought, and are now seeking, to prevent the railway companies from procuring the employees necessary for the maintenance of the rolling stock and equipment and for keeping the railroads in operation. As a result of the activities of the conspiring defendants the number of workmen at the railway shops has been reduced to such an extent that many hundred of freight and passenger trains have already been abandoned, and if the activities of the defendants continue the rolling stock and equipment will deteriorate within a short time, and interstate transportation of passengers and property and the carriage of the mails will be completely obstructed.

The purpose and intent of the defendants, and each of them, and their associates, in conspiring, combining, confederating, agreeing, and arranging together to cause the members of the federated shop crafts, who have failed to quit and abandon the service and employment now to quit and abandon the service and employment of the railway companies as aforesaid, and to prevent the railway companies from hiring or employing persons to replace the nonemployed and idle members of the federated shop crafts, and to prevent the railway companies from having in their service a sufficient number of men to inspect, overhaul, and repair the locomotives and cars, and at all times to keep all of the rolling stock and equipment in a complete state of repair and proper running order, and of committing the unlawful acts aforesaid in pursuance of the unlawful conspiracy, combination, confederation, agreement, and arrangement, was and is to delay, restrain, obstruct, and retard transportation in interstate commerce on the lines of all of the railway companies operating throughout the continental United States, and wholly to obstruct and prevent transportation or movement of any passengers or property whatever in interstate and foreign commerce and the carriage of the mail, in the event the railway companies should recognize and obey and shall continue to recognize and obey decision No. 1036, and should continue to refuse to be forced or coerced into acceding to the unlawful demands of the nonemployed and idle members of the federated shop crafts and agree to pay to them wages in excess of the wages found to be just and reasonable by the Railroad Labor Board.

The unlawful activity of the defendants has increased until it now extends to practically every locality where railway shops are maintained. Some of the carriers have invoked protection through injunctions in the federal courts, and such efforts have been inadequate to prevent the unlawful acts of the conspirators. To effectually end this nation-wide conspiracy against the functions and operations of the federal government, it is necessary that the defendants be enjoined, as sought in this case. The conspiracy charged in the bill constitutes a violation of the provisions of the Sherman Anti-Trust Act and the Transportation Act of 1920. As a result of said conspiracy a thousand mail trains are now discontinued; thousands of loaded freight cars have been standing upon side tracks for weeks, of which the greater number have been purposely and maliciously disabled, to prevent them from being used in the transportation of coal and other commerce; thousands of disabled locomotives stand idle in the yards; the operation of numerous factories in all parts of the country is suspended for the want of fuel, and material and facilities for the transportation of their products; the vicious element of the striking employees have seized upon the situation to create a reign of terror, by dynamiting railroad bridges, removing spikes from rails, placing obstructions upon railway tracks, exploding bombs on the tracks and in the railway yards, and hurling bombs at moving trains, for the purpose of hindering transportation and of deterring by fear the trainmen from operating trains, and passengers from riding thereon.

By the provisions of the Sherman Anti-Trust Act, it is the duty of the several district attorneys, acting under the direction of the Attorney General, to see that all laws of the nation are enforced which are for the protection of the public, and this applies with special force to those laws and rights of

parties fixed by governmental bodies which cannot be enforced, or are difficult of enforcement, by action brought by private citizens. Such power is vested in the Attorney General by the direct and implied provisions contained in the statutes creating and defining the duties of his office and of the Department of Justice. All power relating to the regulation of interstate and foreign commerce is vested by the Constitution in the Congress of the United States, and it is especially the duty of the Attorney General to see that said provision of the Constitution and all congressional legislation based thereon be enforced, and that all findings and orders of bodies created by Congress for the purpose of preserving the free and unhampered flow of interstate and foreign commerce be observed.

The prayer of the bill is for an injunction restraining the parties to the conspiracy from committing certain unlawful acts, such as assaults, displays of force, intimidation, and picketing, the effect of which is to obstruct interstate commerce and the carriage of the mails, and also from doing certain things lawful in themselves, such as persuading employees to leave the service of the companies and persuading persons not to enter the service of the companies, when those things are done in furtherance of the conspiracy to obstruct commerce and the carriage of the mails.

The bill is verified by Charles F. Clyne, United States attorney for the Northern district of Illinois. Attached to it as exhibits are the decision of the Labor Board in Alabama & Vicksburg Railway Company et al. v. Railway Employees' Department, A. F. of L., containing a list of the carriers who were parties to the dispute, instructions issued by defendant Jewell and the officers of the federated shop crafts on June 27, 1922, relative to the conduct of the strike, and a summary prepared by the Department of Justice covering acts of depredation committed in the conduct of the strike, or, as the complainant contends, so closely related in time and place to acts admitted to have been done in the conduct of the strike as to compel the conclusion that they constitute a part of the strike program.

The temporary restraining order was entered on September 1, 1922, and fixed September 11, 1922, as the date for the hearing of the application for a temporary injunction. Notices of such application and subpœnas have been served upon a large number of defendants. Two of the defendants, Jewell and Scott, have entered appearances and filed a motion to dismiss the bill. The temporary restraining order having been extended pending this hearing, the case is now before the court on the application of the Attorney General for a temporary injunction. Many affidavits and other documents have been presented by both the complainant and the two defendants who have appeared and who are contesting the granting of the injunction. The proofs of the complainant are in corroboration and amplification of the averments of the bill. Reports and statements of the departments of the federal government are presented, showing the harmful effect of the activities of the alleged conspirators upon the ability of the railways to perform their duties with respect to interstate transportation and the carriage of the mails. Constitutions, bylaws, and other documents, showing the closeness and completeness of organization on the part of the defendants, are produced. The complainant also introduces bulletins, letters, and other communications, showing that the officers of the defendant organizations were in close touch with all phases of the strike, and were continuously giving directions with reference to its conduct. It also introduces a very large number of affidavits showing conditions throughout the United States, and reciting many acts of mob violence, assaults, intimidations, blowing up of bridges, wrecking of trains, and injuries to engines and other rolling stock and equipment. It is the contention of the complainant that, while the evidence set forth in these affidavits is largely circumstantial, they present a showing of such manifest concert of action that it is impossible reasonably to doubt the participation of the defendants in a common plan.

The defendants present a large number of injunctions issued in suits brought in the federal courts by the carriers, and assert that the equity power of the court should not be exercised in this suit of the United States, because it has been exercised already so many times to protect the property of the carriers

from the acts of the defendants. They also present affidavits touching the circumstances leading up to the strike, and assert that the carriers were the aggressors, and that in calling the strike and in conducting it the unions were waging a defensive warfare against a great combination of capital, which is trying to destroy them. Defendants also present affidavits denying all participation on the part of the unions and their officers in acts of violence or in other unlawful acts. They show a large number of bulletins, instructions, and other communications, in which the members of the unions are warned against committing acts of violence and are urged to conduct the strike by peaceful and lawful methods only; this in support of their contention that the strike was a perfectly lawful step in a labor controversy, that so far as defendant organizations and their officers were concerned it was conducted by lawful means, and that the acts of violence and sabotage shown to have accompanied it were the sporadic acts of irresponsible individuals, and were neither a part of the plan of the strike nor were they approved by the unions and their officers.

H. M. Daugherty, Atty. Gen., John W. H. Crim, Asst. Atty. Gen., Blackburn Esterline, Asst. Sol. Gen., of Washington, D. C., A. A. McLaughlin and James A. Fowler, Sp. Asst. Attys. Gen., Charles F. Clyne, U. S. Atty., of Chicago, Ill., and C. J. McGuire, of Washington, D. C., for the motion.

Donald R. Richberg, of Chicago, Ill., and Frank L. Mulholland, of Toledo, Ohio, for Bert M. Jewell and John Scott, individually, opposed.

Before WILKERSON, District Judge.

WILKERSON, District Judge (after stating the facts as above).
[1] In disposing of this motion it may be well at the outset to emphasize what this case is not. It is not a case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment. It is not a private bill to enjoin indirect injury, as one caused by a secondary boycott, to the property of the complainant. It is, to use the language of Circuit Judge Baker, speaking for the Court of Appeals, Seventh Circuit, in Gasaway v. Borderland Coal Corporation (C. C. A.) 278 Fed. 56, 63, a bill "in the public interest by the government, as parens patriæ, to enjoin * * * an unlawful conspiracy or combination in restraint of trade." It is the conspiracy which is inflicting the public injury for which redress is sought.

The right of the United States to maintain a bill like this under its general equity jurisdiction is no longer open to debate. In the Debs Case, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092, the court held that the national government is charged with the duty of keeping the highways of interstate commerce, including railroads, free from obstruction. Holding that such obstruction is a public nuisance, and sustaining, after an exhaustive review of the authorities, the power of a court of equity to take jurisdiction in such cases by an information filed by the Attorney General, the court said:

"Indeed, it may be affirmed that in no well-considered case has the power of a court of equity to interfere by injunction in cases of public nuisance been denied, the only denial ever being that of a necessity for the exercise of that jurisdiction under the circumstances of the particular case."

Commenting upon the special facts alleged calling for the exercise of all the powers of the court—the facts which in all substantial respects are similar to those alleged in the bill as this case—the court further said (158 U. S. 592, 15 Sup. Ct. 909, 39 L. Ed. 1092):

"That the bill filed in this case alleged special facts calling for the exercise of all the powers of the court is not open to question. The picture drawn in it of the vast interests involved, not merely of the city of Chicago and the state of Illinois, but of all the states, and the general confusion into which the interstate commerce of the country was thrown, the forcible interference with that commerce, the attempted exercise by individuals of powers belonging only to government, and the threatened continuance of such invasions of public right, presented a condition of affairs which called for the fullest exercise of all the powers of the courts. If ever there was a special exigency, one which demanded that the court should do all that courts can do, it was disclosed by this bill, and we need not turn to the public history of the day, which only reaffirms with clearest emphasis all its allegations."

Answering the objection that it is outside the jurisdiction of a court of equity to enjoin the commission of crime, the court said (158 U. S. at page 594, 15 Sup. Ct. 910, 39 L. Ed. 1092):

"The law is full of instances in which the same act may give rise to a civil action and a criminal prosecution. * * * So here the acts of the defendants may or may not have been violations of the criminal law. If they were, that matter is for inquiry in other proceedings. The complaint made against them in this is of disobedience to an order of a civil court, made for the protection of property and the security of rights. If any criminal prosecution be brought against them for the criminal offenses alleged in the bill of complaint, of derailing and wrecking engines and trains, assaulting and disabling employees of the railroad companies, it will be no defense to such prosecution that they disobey the orders of injunction served upon them and have been punished for such disobedience."

And, replying to the argument that the court should stand aloof and not invade the prerogatives of other branches of government in putting down a mob, the court said (158 U. S. at page 597, 15 Sup. Ct. 911, 39 L. Ed. 1092):

"We do not perceive that this argument questions the jurisdiction of the court, but only the expediency of the action of the government in applying for its process. It surely cannot be seriously contended that the court has jurisdiction to enjoin the obstruction of a highway by one person, but that its jurisdiction ceases when the obstruction is by a hundred persons. It may be true, as suggested, that in the excitement of passion a mob will pay little heed to processes issued from the courts, and it may be, as said by counsel in argument, that it would savor somewhat of the puerile and ridiculous to have read a writ of injunction to Lee's army during the late Civil War. It is doubtless true that 'inter arma leges silent,' and in the throes of rebellion or revolution the processes of civil courts are of little avail, for the power of the courts rests on the general support of the people and their recognition of the fact that peaceful remedies are the true resort for the correction of wrongs. But does not counsel's argument imply too much? Is it to be assumed that these defendants were conducting a rebellion or inaugurating a revolution, and that they and their associates were thus placing themselves beyond the reach of the civil process of the courts?"

And, speaking of the propriety of the institution of the suit by the government, the court said (158 U. S. at page 598, 15 Sup. Ct. 911, 39 L. Ed. 1092):

"The outcome, by the very testimony of the defendants, attests the wisdom of the course pursued by the government, and that it was well not to oppose

force simply by force, but to invoke the jurisdiction and judgment of those tribunals to whom by the Constitution and in accordance with the settled conviction of all citizens is committed the determination of questions of right and wrong between individuals, masses, and states."

While the Debs Case, like the one under consideration, arose under unusual circumstances, its basic principles have been reaffirmed repeatedly by the courts. In Loewe v. Lawlor, 208 U. S. 274, 303, 28 Sup. Ct. 301, 311 (52 L. Ed. 488, 13 Ann. Cas. 815), for instance, the court, speaking of the Debs Case, said:

"The Circuit Court proceeded principally upon the Sherman Anti-Trust Law, and granted an injunction. In this court the case was rested upon the broader ground that the federal government had full power over interstate commerce and over the transmission of the mails, and in the exercise of those powers could remove everything put upon highways, natural or artificial, to obstruct the passage of interstate commerce or the carrying of the mails."

Certainly an obstruction which results from blocking the tracks or tearing up the rails does not differ in substance from an obstruction which results from preventing the maintenance of rolling stock and equipment and thereby destroying the instruments by which passengers and property are carried over the rails. Nor can the Debs Case be differentiated because the strike was called in aid of a boycott. The ground of jurisdiction asserted in the Debs Case was the obstruction of interstate commerce and the mails, not the motive which actuated those who created the obstruction.

The bill may be maintained also under the Sherman Act. Section 1 of that act provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. ❖ ❖ ❖"

Section 4 invests the District Courts of the United States with jurisdiction to prevent and restrain violations of the act and provides that—

"It shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations."

In Duplex Printing Press Co. v. Deering et al., 254 U. S. 443, 465, 41 Sup. Ct. 172, 176 (65 L. Ed. 349, 16 A. L. R. 196), the court defines the conspiracy which is prohibited and which may be enjoined, as follows:

"The accepted definition of a conspiracy is: 'A combination of two or more persons by concerted action to accomplish a criminal or unlawful purpose, or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means.' ❖ ❖ ❖ If the purpose be unlawful, it may not be carried out, even by means that otherwise would be legal; and, although the purpose be lawful it may not be carried out by criminal or unlawful means."

That the provisions of the Sherman Act apply with particular force to attempts to interfere with and obstruct the highways of commerce and the instrumentalities by which commerce is carried on is pointed out in Northern Securities Co. v. United States, 193 U. S. 197, 342, 24 Sup. Ct. 436, 459 (48 L. Ed. 679), in the following language:

"If private parties may not, by combination among themselves, restrain interstate and international commerce in violation of an act of Congress, much less can such restraint be tolerated when imposed or attempted to be imposed upon commerce as carried on over public highways."

[2] The language of the statute makes no distinction between classes. It prohibits any combination whatever, whether of labor or capital, to secure action which essentially obstructs the free flow of commerce between the states. In Loewe v. Lawlor, supra, the court quoted with approval from the opinion of the judge of the Circuit Court for the Eastern District of Louisiana granting an injunction against a combination of laborers. The court said (208 U. S. 301, 28 Sup. Ct. 310, 52 L. Ed. 488, 13 Ann. Cas. 815):

"In an early case, United States v. Workingmen's Amalgamated Council, 54 Fed. 994, the United States filed a bill under the Sherman Act in the Circuit Court for the Eastern District of Louisiana, averring the existence of 'a gigantic and widespread combination of the members of a multitude of separate organizations for the purpose of restraining the commerce among the several states and with foreign countries,' and it was contended that the statute did not refer to combinations of laborers. But the court, granting the injunction, said: 'I think the congressional debates show that the statute had its origin in the evils of massed capital; but, when the Congress came to formulating the prohibition, which is the yardstick for measuring the complainant's right to the injunction, it expressed it in these words: "Every contract or combination in the form of trust, or otherwise in restraint of trade or commerce among the several states or with foreign nations, is hereby declared to be illegal." The subject had so broadened in the minds of the legislators that the source of the evil was not regarded as material, and the evil in its entirety is dealt with. They made the interdiction include combinations of labor as well as of capital; in fact, all combinations in restraint of commerce, without reference to the character of the persons who entered into them. It is true this statute has not been much expounded by judges, but, as it seems to me, its meaning, as far as relates to the sort of combinations to which it is to apply, is manifest, and that it includes combinations which are composed of laborers acting in the interest of laborers. * * * It is the successful effort of the combination of the defendants to intimidate and overawe others who were at work in conducting or carrying on the commerce of the country, in which the court finds their error and their violation of the statute. One of the intended results of their combined action was the forced stagnation of all the commerce which flowed through New Orleans. This intent and combined action are none the less unlawful because they included in their scope the paralysis of all other business within the city as well.' "

And in Gompers v. Bucks Stove & Range Co., 221 U. S. 418, 438, 31 Sup. Ct. 492, 497 (55 L. Ed. 797, 34 L. R. A. [N. S.] 874), the court, referring to Loewe v. Lawlor, supra, said:

"The principle announced by the court was general. It covered any illegal means by which interstate commerce is restrained, whether by unlawful combinations of capital, or unlawful combinations of labor. * * * The court's protective and restraining powers extend to every device whereby property is irreparably damaged or commerce is illegally restrained. To hold that the restraint of trade under the Sherman Anti-Trust Act, or on general principles of law, could be enjoined, but that the means through which the restraint was accomplished could not be enjoined, would be to render the law impotent."

In United Mine Workers et al. v. Coronado Coal Co., 258 U. S. ——, 42 Sup. Ct. 570, 66 L. Ed. ——, decided June 5, 1922, the court, speaking of indirect obstructions to interstate commerce, said:·

"It is clear * * * that, if Congress deems certain recurring practices, though not really part of interstate commerce, likely to obstruct, restrain or burden it, it has the power to subject them to national supervision and restraint. Again, it has the power to punish conspiracies, in which such practices are part of the plan to hinder, restrain, or monopolize interstate commerce. But in the latter case the intent to injure, obstruct, or restrain interstate commerce must appear as an obvious consequence of what is to be done, or be shown by direct evidence or other circumstances."

Commenting on Loewe v. Lawlor, supra, and Eastern States Retail Lumber Dealers' Association v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788, the court said:

"It was the commerce itself which was the object of the conspiracy."

And, referring to United States v. Patten, 226 U. S. 525, 33 Sup. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325, the court said:

"The necessary effect of the control of the available supply would be to obstruct and restrain interstate commerce, and so the conspirators were charged with the intent to restrain."

The defendants assert, however, that the power of the United States to deal with combinations of the kind described in the bill has been curtailed by sections 6 and 20 of the Clayton Act. Section 6 provides:

"That the labor of a human being is not a commodity or article of commerce. Nothing contained in the anti-trust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade under the anti-trust laws."

With reference to this section the Supreme Court in Duplex Printing Press Co. v. Deering et al., supra, said (254 U. S. 469, 41 Sup. Ct. 177, 65 L. Ed. 349, 16 A. L. R. 196):

"As to section 6, it seems to us its principal importance in this discussion is for what it does *not* authorize, and for the limit it sets to the immunity conferred. The section assumes the normal objects of a labor organization to be legitimate, and declares that nothing in the anti-trust laws shall be construed to forbid the existence and operation of such organizations or to forbid their members from *lawfully* carrying out their *legitimate* objects; and that such an organization shall not be held in itself—merely because of its existence and operation—to be an illegal combination or conspiracy in restraint of trade. But there is nothing in the section to exempt such an organization or its members from accountability where *it or they depart from its normal and legitimate objects* and engage in an actual combination or conspiracy in restraint of trade. And by no fair or permissible construction can it be taken as authorizing any activity otherwise unlawful, or enabling a normally lawful organization to become a cloak for an illegal combination or conspiracy in restraint of trade as defined by the anti-trust laws."

Section 20 provides:

"That no restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property

right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney.

"And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

[3, 4] This section introduces an exception to the power of a federal court of equity to give injunctive relief under general principles of equity jurisdiction. The field of that exception is hedged about with limitations of a threefold character. Those who rely on the exception must bring themselves within all three limitations in order to take advantage of its exemption and privilege. The first limitation is to the character of the parties to the suit. The second limitation is in the subject-matter of the action. The third limitation of the exception is in the definition of acts that may not be enjoined in such cases as fulfill the previous requirements. That this suit of the United States does not fall within the exception is too plain for argument. The only portion of the section which even remotely touches any question involved in this case are the concluding words:

"Nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

Speaking of this portion of the section, the Supreme Court, in Duplex Printing Press Co. v. Deering et al., supra, said (254 U. S. 470, 41 Sup. Ct. 178, 65 L. Ed. 349, 16 A. L. R. 196):

"If the qualifying words are to have any effect, they must operate to confine the restriction upon the granting of injunctions and also the relaxation of the provisions of the anti-trust and other laws of the United States, to parties standing in approximate relation to a controversy such as is particularly described. * * * It must be borne in mind that the section imposes an exceptional and extraordinary restriction upon the equity powers of the courts of the United States and upon the general operation of the anti-trust laws, a restriction in the nature of a special privilege or immunity to a particular class, with corresponding detriment to the general public; and it would violate rules of statutory construction having general application and far-reaching importance to enlarge that special privilege by resorting to a loose construction of the section, not to speak of ignoring or slighting the qualifying words that are found in it. Full and fair effect will be given to every word if the exceptional privilege be confined—as the natural meaning of the words confines it—to those who are approximately and substantially concerned as parties to an actual dispute respecting the terms or conditions of their own employment, past, present, or prospective."

[5] Certainly it was not the intention of the Congress to make the acts specified in section 20 immune from punishment, even though they are done in furtherance of an unlawful or criminal conspiracy. Granting that those acts may not be punished when done under circumstances which amount to nothing more than a labor dispute, that controversy may broaden out so that the purpose of those waging it may include the accomplishment of unlawful ends. Can it be said that, merely because the element of a labor controversy remains in the situation, the actors may not be punished when their purpose is not only the accomplishment of something with respect to wages or conditions of employment, but also the destruction of property, the invasion of the rights of others, and the infliction of injury upon the public. Such an interpretation conflicts with elementary rules of statutory construction. Moreover, it must be borne in mind that the Sherman Act punishes the conspiracies at which it is aimed on the common-law footing; that is to say, it does not make the doing of any act other than the act of conspiring a condition of liability. To give to section 20 any such construction as has been here urged by the defendants would be to make, as to labor combinations, a law under which the restraint of trade could be enjoined but the means through which the restraint was accomplished could not be enjoined.

[6] The law is clear, in my opinion, that if the dominating, primary purpose of the combination is to restrain trade, or to do things unlawful in themselves, and in which, by reason of their inherent nature operate to restrain trade, the purpose of the combination is unlawful, and that purpose may not be carried out, even by means that otherwise would be legal.

[7] We come, then, to a determination of the question of fact. Have we here a combination, the primary, controlling purpose of which, regardless of disputes about wages and conditions of employment, is the obstruction of interstate commerce; or, from another point of view, have we a combination of actors in a labor dispute, adopting for the accomplishment of their ends unlawful means necessarily obstructive of interstate commerce, and so interwoven with acts lawful in themselves that the whole plan must be condemned as a restraint of trade? In cases of this kind the proof is, of necessity, largely circumstantial. Acts must be taken in their relation to each other. Men must be presumed to intend the natural consequence of their acts. Proclamations of nonparticipation and exhortations to keep the peace cannot relieve from responsibility for a series of acts so interrelated and interwoven that they bear on their face proof of design and plan.

Speaking of the character of proof possible in cases of this kind, the Supreme Court, in Eastern States Retail Lumber Dealers' Association v. United States, supra, said (234 U. S. 612, 34 Sup. Ct. 954, 58 L. Ed. 1490, L. R. A. 1915A, 788):

"But it is said that in order to show a combination or conspiracy within the Sherman Act some agreement must be shown under which the concerted action is taken. It is elementary, however, that conspiracies are seldom capable of proof by direct testimony and may be inferred from the things actually done, and when in this case by concerted action the names of whole-

salers who were reported as having made sales to consumers were periodically reported to the other members of the associations the conspiracy to accomplish that which was the natural consequence of such action may be readily inferred."

In Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 249, 38 Sup. Ct. 65, 72 (62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461, the court, considering the admissibility of the declarations and conduct of third parties, said:

"It is necessary to show by independent evidence that there was a combination between them and defendants, but it is not necessary to show by independent evidence that the combination was criminal or otherwise unlawful. The element of illegality may be shown by the declarations themselves. The rule of evidence is commonly applied in criminal cases, but is of general operation."

In Chicago, Wilmington & Vermilion Coal Co. v. People, 214 Ill. 421, 453, 73 N. E. 770, 780, the rule of proof is thus stated:

"A mere tacit understanding between conspirators to work to a common purpose is all that is essential to a guilty, actionable combination. Individual intent by two or more persons to do an unlawful act or a lawful act by unlawful means is the first step in that regard. Next follows. concurrence between such individuals—not concurrence of action, merely (United States v. Barrett [C. C.] 65 Fed. 62), but concurrence in mental intent to effect the common purpose, each to aid the others in that regard. Mutuality in the undertaking may be secured without any express agreement, and without a spoken or written word between the conspirators or a meeting of the members of the combine, or their even all knowing each other, or the precise thing to be accomplished or plans for its accomplishment, either in a general way or in detail, being distinctly stated by any member of the combine to any other member. If there is a meeting of minds, brought about in any way, to accomplish the common purpose, the essentials of a guilty combination are all satisfied."

[8] None of the defendants in this case have answered the bill. Two have filed motions to dismiss, and have presented affidavits which leave a large number of averments of the bill unchallenged on the record. The fact that the defendants have been acting in combination is not denied. On the contrary, the defendants themselves have produced evidence of the closest association and co-operation on the part of the defendant organizations. That the officers of the unions gave directions concerning the strike from the outset is likewise admitted. The only material question really in dispute on the record is the responsibility in law of the defendants for the large number of unlawful acts shown to have been committed, many of them by unknown parties.

Notwithstanding the warnings against acts of violence set out in the instructions of June 27, 1922, there began, throughout the country, a series of depredations which rapidly developed, in some portions, into a veritable reign of terror. Railroad bridges were dynamited; spikes were removed from rails; obstructions were placed upon railway tracks; bombs were exploded on tracks and in railroad yards and hurled at moving trains. Notwithstanding the admonitions of the leaders of the combination to use peaceful means only, the real situation at most of the places where the strike was in progress was that employees were insulted, assaulted, and otherwise intimidated. The word of the "peaceful" picket, spoken in the vicinity of the shops, was emphasized in the darkness of night by the club and pistol of the "unknown party."

Regardless of the instructions that no injury must be inflicted upon property, there was sabotage on a large scale. Engines, cars, and equipment were tampered with, and innumerable acts of malicious mischief committed, which endangered the lives of both passengers and those operating trains.

These unlawful acts are shown to have been on such a large scale, and in point of time and place so connected with the admitted conduct of the strike, that it is impossible on the record here to view them in any other light than as done in furtherance of a common purpose and as part of a common plan. This record does not permit the conclusion that those who are at the head of this combination did not actually know that these things were being done, and that they were the direct result of the methods by which the strike was being conducted. And if they did not actually know they were charged with such knowledge.

[9] What is legal knowledge of a fact? It seems to have been assumed by the defendants that no one is chargeable with more knowledge than he chooses to have; that he is permitted to close his eyes when he pleases upon all sources of information, and then excuse his ignorance by saying that he does not see anything. In criminal, as well as civil affairs, every man is presumed to know everything that he can learn upon inquiry, when he has facts in his possession which suggest the inquiry. Yet, with knowledge of this intolerable situation, nationwide in its scope, the leaders of this combination repeatedly sent out to the members of their organizations bulletins and communications urging the men to greater activity.

On August 28, 1922, with the record of almost two months of continuous disorder and violence before them, the leaders of these organizations sent out to their members the following:

"If there be any among us who regrets the step they have taken, let them turn back now, so that the brand of Cain can be on them for all time, because this has ceased to be a pink tea or a vacation, but a real he-man strike from now on, and if you cannot measure up to that standard, this is no place for you. However, keep in mind our policy that the laws of the land must be obeyed, but there is so much that can be done that has not been done without violating the laws that you are now asked to get on the job and do your damnedest and then a little bit more. If the miners could fight five months, then surely our people can, too; they won by sticking. We can do likewise, and if you are not in this game to do your full duty, then step aside and let a man take your place. These may be harsh words, but this is war—industrial war—and no place for kid gloves or soft talk. Now, boys, let's go from here. 'No surrender!'"

And at about the same time there is the following communication:

"The thought strikes us that if this latest attempt in New York should end as did others that preceded it that our members should wake up to the fact that inasmuch as these Eastern hard-boiled executives want a finish fight that we may as well clear decks and give them a run during the month of September that will satisfy them that we have abandoned the policy of watchful waiting and are determined to show them what our real power of economic determination really amounts to."

These defendants will not be permitted, upon the record here, to deny responsibility for these unlawful acts. They will not be permitted to continue acts which, even though they may be peaceable and

lawful in themselves, it has been demonstrated are only part of a program of unlawful conduct and are done for the accomplishment of an unlawful purpose. It hardly need be said that this conclusion is upon the record as it now stands, and leaves the defendants free to present their contention again, if and when a different case is made by the pleadings and proof.

[10] It is asserted by the defendants that to prohibit some of the acts against which the complainant seeks an injunction is to deprive them of fundamental rights guaranteed by the Constitution. This contention has been answered by what has been said with reference to the unlawful purpose of the conspiracy. "The cardinal error of defendants' position," to use the language of the Supreme Court in Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 253, 38 Sup. Ct. 65, 73 (62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461, "lies in the assumption that the right is so absolute that it may be exercised under any circumstances and without any qualification; whereas in truth, like other rights that exist in civilized society, it must always be exercised with reasonable regard for the conflicting rights of others." In Aikens v. Wisconsin, 195 U. S. 194, 206, 25 Sup. Ct. 3 (49 L. Ed. 154) the court said:

"No conduct has such an absolute privilege as to justify all possible schemes of which it may be a part. The most innocent and constitutionally protected of acts or omissions may be made a step in a criminal plot, and if it is a step in a plot neither its innocence nor the Constitution is sufficient to prevent the punishment of the plot by law."

[11] The record in this case shows that the so-called peaceable and lawful acts are so interwoven with the whole plan of intimidation and obstruction that to go through the formality of enjoining the commission of assaults and other acts of violence and leave the defendants free to pursue the open and ostensibly peaceful part of their program would be an idle ceremony.

As to the right of the complainant to an injunction against peaceable persuasion, the following in Duplex Printing Press Co. v. Deering, supra, is pertinent (254 U. S. 467, 41 Sup. Ct. 177, 65 L. Ed. 349, 16 A. L. R. 196):

"It is settled by these decisions that such a restraint produced by peaceable persuasion is as much within the prohibition as one accomplished by force or threats of force, and it is not to be justified by the fact that the participants in the combination or conspiracy may have some object beneficial to themselves or their associates which possibly they might have been at liberty to pursue in the absence of the statute."

The language of Circuit Judge Woods in United States v. Debs (C. C.) 64 Fed. 724, 763, applies with striking force to this case:

"The rule is familiar in criminal jurisprudence that any act, however innocent in itself, becomes wrongful or criminal when done in furtherance of an unlawful design. But whether or not, in a particular case, an injunction will be appropriate, and to what extent it shall go, if granted, will depend on other considerations than the mere wrongfulness or illegality of the act or conduct proposed to be enjoined. The right of men to strike peaceably, and the right to advise a peaceable strike, which the law does not presume to be impossible, is not questioned. But if men enter into a conspiracy to do an unlawful thing, and, in order to accomplish their purpose, advise workmen to

go upon a strike, knowing that violence and wrong will be the probable outcome, neither in law nor in morals can they escape responsibility."

And as to the right to an injunction against picketing the following from American Steel Foundries v. Tri-City Central Trades Councils et al., 257 U. S. 184, 42 Sup. Ct. 72, 66 L. Ed. ——, decided by the Supreme Court of the United States December 5, 1921, is applicable to the situation disclosed by the evidence in this case:

"The name 'picket' indicated a militant purpose, inconsistent with peaceable persuasion. The crowds they drew made the passage of the employees to and from the place of work, one of running the gauntlet. Persuasion or communication attempted in such a presence and under such conditions was anything but peaceable and lawful. When one or more assaults or disturbances ensued, they characterized the whole campaign, which became effective because of its intimidating character, in spite of the admonitions given by the leaders to their followers as to lawful methods to be pursued, however sincere."

[12] Defendants assert, as a ground against the granting of the relief sought by the complainant, that the strike was a defensive measure against a plot of the railway companies to destroy the unions. The argument seems to be that the defendants are justified in inflicting upon the public any injury which it may be proper for them to inflict upon their adversaries in this conflict. It must be remembered, however, that this is a suit brought for the benefit of the public. Restraint of trade may not be adopted as a weapon in industrial warfare. The court must act upon the case now before it, and give its aid to the removal of the obstructions to commerce which are found to exist.

[13] It has been suggested by the defendants that, as the strike has been settled on some of the railroads, there is no need for the injunction, or at least for one of the breadth sought by the government. The right to relief is to be determined by the status existing at the time of the filing of the bill. Rights do not ebb and flow. If they are invaded, a recourse to courts of justice is rendered necessary, and it is no defense to the invasion of right that since the institution of the suit the invasion has ceased. With emphasis would this be true where, as here, the right to invade is not disclaimed.

Defendants have submitted a motion to dismiss the bill. The first two grounds challenge the sufficiency of the bill as a basis for the relief sought. The third ground is that—

"Relief was sought in said bill and was obtained in said restraining order for ulterior and unlawful purposes, upon misrepresentation and suppression of matters of fact and law, the disclosure of which was required by good faith."

During the hearing, which has lasted almost two weeks, the defendants have neither offered nor suggested a scintilla of proof tending to establish this averment in the motion to dismiss. The restraining order was entered after a hearing at which both the averments of the bill and the questions of law involved were fully and fairly presented.

It follows, therefore, that the motion to dismiss the bill must be denied. It follows, also, that the complainant is entitled to an injunction prohibiting the parties to this combination from committing the unlaw-

ful acts charged, the effect of which is to obstruct interstate transportation and the carriage of the mails or to restrain interstate commerce, as well as the acts charged which are lawful in themselves, when done in furtherance of a conspiracy to obstruct interstate transportation and the carriage of the mails or to restrain interstate commerce. The parties will be heard as to the form of order to be entered in conformity with the views here expressed.