UNITED STATES *v.* NATIONAL CITY LINES, INC. ET AL.

No. 544.   Argued April 28, 1948.—Decided June 7, 1948.

*Charles H. Weston* argued the cause for the United States. With him on the brief were *George T. Washington, Acting Solicitor General* (for this case), *Assistant Attorney General Sonnett, Robert G. Seaks* and *Philip Elman.*

*C. Frank Reavis* argued the cause for appellees. With him on the brief were *Martin D. Jacobs, Horace G. Hitchcock, Oscar A. Trippet, Henry M. Hogan, N. J. Rosiello, H. D. Emery, Rayburn L. Foster, R. B. F. Hummer, Hubert T. Morrow, Marshall P. Madison, Eugene M. Prince, Francis R. Kirkham* and *Everett A. Mathews.*

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

In *United States* v. *Scophony Corp.,* 333 U. S. 795, we recently considered the meaning and effect of § 12 of the Clayton Act,[1] providing for venue and service of process in civil antitrust proceedings against private corporations. This case brings before us another phase of the section's effect in like proceedings. The principal ques-

---

[1] "SEC. 12. That any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found." 38 Stat. 736, 15 U. S. C. § 22.

tion, and the only one we find it necessary to consider, is whether the choice of forums given to the plaintiff by § 12 is subject to qualification by judicial application of the doctrine of *forum non conveniens.*

The suit was brought by the United States against nine corporations [2] for alleged violation of §§ 1 and 2 of the Sherman Act. 26 Stat. 209, 15 U. S. C. §§ 1, 2. The basic charge is that the appellees conspired to acquire control of local transportation companies in numerous cities located in widely different parts of the United States,[3] and to restrain and monopolize interstate commerce in motorbusses, petroleum supplies, tires and tubes sold to those companies, contrary to the Act's prohi-

---

[2] These, with the states of their incorporation and their principal places of business, are as follows:

| Corporation | State of incorporation | Principal place of business |
|---|---|---|
| National City Lines, Inc. | Delaware | Chicago |
| American City Lines, Inc. | " | " |
| Pacific City Lines, Inc. | " | Oakland, Calif. |
| Standard Oil Co. of California | " | San Francisco |
| Federal Engineering Corp. | California | " |
| Phillips Petroleum Co. | Delaware | Bartlesville, Okla. |
| General Motors Corp. | " | Detroit, Mich. |
| Firestone Tire & Rubber Co. | Ohio | Akron, Ohio |
| Mack Manufacturing Corp. | Delaware | New York |

[3] Forty-four cities in sixteen states are included. The states are as widely scattered as California, Florida, Maryland, Michigan, Nebraska, Texas and Washington. The larger local transportation systems include those of Baltimore, St. Louis, Salt Lake City, Los Angeles and Oakland. The largest concentrations of smaller systems are in Illinois, with eleven cities; California with nine (excluding Los Angeles); and Michigan with four. The local operating companies were not named as parties defendant.

bitions.[4] Injunctive and other relief of an equitable nature was sought.[5]

The appellees filed various motions, including the one involved in this appeal. It sought dismissal of the complaint on the ground that the District Court for the Southern District of California was not a convenient forum for the trial. This motion was supported by a showing not only of inconvenience to the defendants of trial in the California district, but also that the District Court for the Northern District of Illinois, Eastern Division (Chicago), would be the most convenient forum for them. The showing was by affidavits, executed by officers, attorneys and employees of the corporate defendants.[6]

---

[4] The appellee companies fall into two groups. The largest, which may be called the supplier group, includes the six last named in note 2 above. Except Federal, they are engaged in producing and distributing the commodities purchased by the local operating companies, the sale of which is charged to be monopolized and restrained. Federal is a wholly owned subsidiary of Standard, engaged in managing investments for Standard.

The other group, including the first three companies listed in note 2, is collectively called City Lines. National is a holding company with operations directed from Chicago. American and Pacific are its subsidiaries. The three own, control or have substantial interests in the operating companies.

The complaint charges that the supplier appellees furnish capital to City Lines for acquiring control of the local operating systems, upon the understanding that City Lines cause all requirements of the local systems in busses, petroleum products, tires and tubes to be purchased from the supplier appellees and no other sellers.

[5] The prayer of the complaint sought complete divestiture of the supplier appellees' financial interests in City Lines; partial divestiture of City Lines' interests in local transportation companies; voiding of existing contracts between the supplier appellees and City Lines; and an injunction against purchases from those suppliers by City Lines or their operating companies, except in accordance with a competitive bidding plan to be included in the decree.

[6] In highly attenuated summary the showing was that the transactions creating the core of the charged conspiracy took place chiefly

Counteraffidavits were filed in opposition on behalf of the Government.[7]

After oral argument, the District Court filed findings of fact and conclusions of law together with a written opinion, substantially accepting appellees' showing and sustaining the motion. 7 F. R. D. 456. Accordingly it entered judgment dismissing the complaint, but without prejudice to the institution of a similar suit against the named defendants "in a more appropriate and convenient forum." This decision is brought to us for review on direct appeal pursuant to the statutes applicable in such cases.[8]

It is not disputed that the District Court has jurisdiction in the basic sense of power to hear and determine the cause or that it has venue within the provisions of § 12.[9] Nor can it be questioned that any of the defendants can be brought personally within that court's jurisdiction by service of process made in accordance with

in or near Chicago; appellees' chief witnesses and documentary evidence are located there; their transportation to Los Angeles and extended presence there will cause great hardship; no defendant "resides" or has its principal office or place of business in the California district (cf. note 2); and two trials in distant cities, see text *infra* at note 41, will greatly magnify the hardship. See 7 F. R. D. 456, 465.

[7] The Government stresses that three of the five supplier defendants transact business and are "found," cf. note 1, in the California district; the volume of sales allegedly restrained is much greater on the Pacific Coast than elsewhere; substantial portions of the evidence, oral and documentary, will be produced from California, etc. Cf. 7 F. R. D. 456, 465.

[8] 32 Stat. 823, 36. Stat. 1167, 15 U. S. C. § 29; 43 Stat. 938, 28 U. S. C. § 345.

[9] It is conceded that three of the defendants, Standard, General Motors, and Firestone, transact business within the Southern District of California. The others apparently were served either pursuant to the concluding clause of § 12 or pursuant to § 5 of the Sherman Act. See note 10 *infra*.

the provisions of either § 12, or those of § 5 of the Sherman Act.[10] The only question presented concerning the court's power is whether, having jurisdiction and venue of the cause and personal jurisdiction of the defendants, the court also was authorized to decline to exercise its jurisdiction upon finding, without abuse of discretion, that the forum was not a convenient one within the scope of the non-statutory doctrine commonly, though not too accurately, labeled *forum non conveniens*.

It would serve no useful purpose to review in detail the reasoning or the authorities upon which the District Court ruled the doctrine applicable in such cases as this, or therefore the further groundings upon which it proceeded in holding the forum inconvenient. For the view has prevailed without qualification during the life of § 12, thirty-four years, that the choice of venues expressly given to the plaintiff is not to be qualified by any power of a court having venue under any of the section's alternatives to decline to exercise the jurisdiction conferred. None of the decisions on which the District Court relied suggested, much less decided, that such a power exists. This therefore is a case of first impression, seeking departure from long-established practice. Moreover, the analogies drawn from other types of cases in which the doctrine has been applied[11] cannot survive in the face of the section's explicit terms and the patent intent of Congress in enacting it.

---

[10] "Sec 5. Whenever it shall appear to the court before which any proceeding under section four of this act may be pending, that the ends of justice require that other parties should be brought before the court, the court may cause them to be summoned, whether they reside in the district in which the court is held or not; and subpoenas to that end may be served in any district by the marshal thereof." 26 Stat. 210, 15 U. S. C. § 5. Section 4 of the Sherman Act (*i. e.*, "this act") refers specifically to civil actions brought by the Government. Cf. *Eastman Co.* v. *Southern Photo Co.*, 273 U. S. 359, 374.

[11] See note 46 *infra*.

In the *Scophony* case we gave attention to the history of § 12, which as there related is as pertinent to the question now presented as it was to the issues then under consideration.[12]   Reference to the *Scophony* opinion, Part I, 333 U. S. at 802–810, will avoid the necessity for repeating the history here *in extenso*.   But its present applicability will be accentuated by recalling that we reaffirmed the ruling in *Eastman Co.* v. *Southern Photo Co.*, 273 U. S. 359, namely, that § 12 of the Clayton Act had enlarged the venue provision of § 7 of the Sherman Act, with the intent and effect to give the plaintiff the right to bring antitrust proceedings not only in the districts where the corporate defendant "resides or is found," as § 7 had authorized, but also "in any district wherein it . . . transacts business." [13]

In the *Eastman* case, as the *Scophony* opinion emphasized, the Court had rejected the argument that the addition of "or transacts business" was no more than a redundant reformulation of "is found"; instead it gave the added words broader and less technical meaning than "is found" had acquired under prior decisions.[14]   This was done, as the *Eastman* opinion stated, because accepting the contrary view would have rendered the addition meaningless and defeated the plain remedial purpose of § 12. 273 U. S. at 373.   That section, the Court held, supplemented "the remedial provision of the Anti-Trust Act for the redress of injuries resulting from illegal restraints upon interstate trade, by relieving the injured person from the necessity of resorting for the redress of wrongs com-

---

[12] In the *Scophony* case we were concerned, not as here with any question of discretion to decline the exercise of jurisdiction, but in presently pertinent part with the tests of venue prescribed by the section and whether, on the facts presented, those tests had been met, so as to establish venue in the district of suit.

[13] See note 1.

[14] See *United States* v. *Scophony Corp.*, 333 U. S. 795, Part I at 802–810.

mitted by a non-resident corporation, to a district, however distant, in which it resides or may be 'found'—*often an insuperable obstacle—and enabling him to institute the suit in a district, frequently that of his own residence, in which the corporation in fact transacts business,* and bring it before the court by the service of process in a district in which it resides or may be 'found.' " (Emphasis added.) 273 U. S. at 373–374.

The *Scophony* opinion reaffirmed this view: "Thus, by substituting practical, business conceptions for the previous hair-splitting legal technicalities encrusted upon the 'found'–'present'–'carrying-on-business' sequence, the Court yielded to and made effective Congress' remedial purpose. Thereby it relieved persons injured through corporate violations of the antitrust laws from the 'often insuperable obstacle' of resorting to distant forums for redress of wrongs done in the places of their business or residence. A foreign corporation no longer could come to a district, perpetrate there the injuries outlawed, and then by retreating or even without retreating to its headquarters defeat or delay the retribution due." 333 U. S. at 808.

These conclusions concerning the section's intent and effect are altogether inconsistent with any idea that the defendant corporation can defeat the plaintiff's choice of venue as given, by asking for and securing dismissal of the suit, either on the ground that the venue selected within the statutory limits is inconvenient for the defendant or that another authorized venue is more convenient for it.

No such discretionary power had been exercised by any court during the twenty years of the Sherman Act's application prior to the enactment of § 12, under the narrower range of choice afforded by § 7. None had been suggested, and uniform practice had established that the plaintiff's choice was conclusive, as was true later under § 12 until the deviation in this case.

When therefore Congress came to face the problem of making the nation's antitrust policy more effective through the Clayton Act's provisions, that body was not confronted with any problem of abuse by plaintiffs in selecting venue for antitrust suits; nor was it concerned with any question of providing means by which the defendants in such suits might defeat the plaintiff's choice to serve their own convenience. Congress' concern was quite the opposite. It was to provide broader and more effective relief, both substantively and procedurally, for persons injured by violations of its antitrust policy.[15] Insofar as convenience in bringing suit and conducting trial was involved, the purpose was to make these less inconvenient for plaintiffs or, as was said in the *Eastman* opinion, to remove the "often insuperable obstacle" thrown in their way by the existing venue restrictions.

To have broadened the choice of venue for the reasons which brought about that action, only to have it narrowed again by application of the vague and discretionary power[16] comprehended by *forum non conveniens*, would have been incongruous, to say the least. In making

---

[15] The Clayton Act hardly can be regarded as a statute for the relief of corporate defendants in antitrust proceedings from either procedural or substantive abuses. See Levy, The Clayton Law— An Imperfect Supplement to the Sherman Law, 3 Va. L. Rev. 411.

[16] "Wisely, it has not been attempted to catalogue the circumstances which will justify or require either grant or denial of remedy. The doctrine leaves much to the discretion of the court to which plaintiff resorts, and experience has not shown a judicial tendency to renounce one's own jurisdiction so strong as to result in many abuses.

"If the combination and weight of factors requisite to given results are difficult to forecast or state, those to be considered are not difficult to name. An interest to be considered, and the one likely to be most pressed, is the private interest of the litigant. . . . The court will weigh relative advantages and obstacles to fair trial." *Gulf Oil Corp.* v. *Gilbert,* 330 U. S. 501, 508.

the change Congress did not authorize plaintiffs to institute civil antitrust suits in the newly specified districts, merely in order to have them transferred back for trial to one of the districts comprehended by § 7. It intended trial to take place in the district specified by the statute and selected by the plaintiff.[17]

This conclusion is supported as strongly by the history of the legislative proceedings relating to the enactment of § 12 as by the foregoing judicial constructions. Section 7 of the Sherman Act had limited venue, as we have noted, to districts in which the defendant "resides or is found." As originally introduced in the House, two sections of the Clayton Act, §§ 4 (then § 5) and 12 (then § 10),[18] perpetuated those provisions.[19] During discussion on the floor, however, various Representatives demanded broader choice of venue for plaintiffs. The demand related to both sections, and the discussion went

---

[17] The *Eastman* opinion referred to the disadvantages suffered by plaintiffs under § 7 of the Sherman Act who were injured where they resided or conducted their business, only to be forced to seek out the wrongdoing company in a distant forum to secure venue and service of process, and therefore also to transport witnesses and incur other disadvantages in trial. 273 U. S. 359, 373–374. Likewise the legislative discussions hereinafter cited uniformly treat the problem as one involving both instituting the suit and trying it. There is no hint that it was contemplated the two phases of the litigation might be separated and conducted in different places. See, *e. g.,* notes 31 and 32 *infra.*

[18] Section 12 began as § 10, became § 11 in the Senate, and finally § 12 in conference. Similarly, § 4 began as § 5, changed first to § 3, and finally to § 4. Section 4 provides for recovery of treble damages in private antitrust proceedings and its venue provisions apply in terms only to such suits. Section 12 applies to "any suit, action, or proceeding under the antitrust laws against a corporation." This literally is broad enough to include the suits comprehended by § 4.

[19] The original wording of the two sections in respect to venue was slightly different but the substance was identical, both following the preexisting provisions of § 7 of the Sherman Act.

forward now with reference to one, now the other, now both.

The basic aim of the advocates of change was to give the plaintiff the right to bring suit and have it tried in the district where the defendant had committed violations of the Act and inflicted the forbidden injuries.[20]   At first they were not much concerned with the exact formulation of the language to accomplish this, several formulas being proposed from time to time.[21]   But they were convinced that restricting the choice of venue to districts in which the defendant "resides or is found" was not adequate to assure that the suit could be brought where the cause of action arose, and therefore insisted on change in order to assure that result.[22]

---

[20] *E. g.,* Representative Dickinson urged that the language "be extended sufficiently to reach every contingency, so that these concerns may be sued in that jurisdiction where they commit the wrong, where the acts complained of may be committed, where the officers, agents, or employees, acting for their master corporation, may be found setting aside the law, and where the witnesses are easily obtainable . . . ." 51 Cong. Rec. 9190.   Later he stated that he wanted to "give the widest liberty of bringing suits where the damage is done and where the action arose." 51 Cong. Rec. 9417.

Representative Sumners spoke to the same effect: "Mr. Chairman, I believe this matter of venue is one of the most important connected with the whole subject of antitrust legislation. . . .   The philosophy of legislation with regard to this subject should give the venue at the place wherein the cause of action arises." *Id.* 9467.   See also *id.* 9414, 9415, 9608.

[21] "Why not at the end of the section, after the word 'found,' add other words, such as 'doing business, or violating the provisions of this law, or wherever it may do business or where its agents, officers, or employees may be found,' or other appropriate language.   A dozen suggestions may be made in the way of amendment." *Id.* 9190.   See also *id.* 9414–9417, 9466, 9607, 9663, 9682.

[22] "Mr. SCOTT. What is the gentleman's understanding of the word 'found'; what is its import as used in this section?

"Mr. DICKINSON. I understand that there is some decision by some court that I am not very familiar with that may possibly cover

The committee sponsoring the bill had no objection to this purpose; indeed its members expressly approved it.[23] But at first they opposed any amendment, because they thought the object fully achieved by the words "is found."[24] Over this difference the discussion went for-

---

the very thought suggested by my proposed amendment. I do not believe that it meets the situation, and if there be any doubt about it, in order that the Government may prosecute successfully and institute suits and actions and have trials the language ought to be clear and definite, and so plain that he who runs may read, so that there can not be two constructions." *Id.* 9415.

"Mr. Cullop. May I suggest . . . that every suit which has arisen under the Sherman antitrust law has been brought at the home of the corporation itself, or at its principal place of business, and therefore there was no occasion to construe this language, 'is found,' which is ambiguous and uncertain. If you are to construe 'is found,' you will have to construe that as the place of the residence of the corporation, because it is not migratory. You can not get service upon some person traveling throughout the country and hold your jurisdiction throughout that territory.

"Mr. Carlin. Why should not the suit be brought in the habitat of the corporation? We have been successful so far in that matter.

"Mr. Cullop. In this case for the very best reason, I think. The gentleman from Virginia [Mr. Carlin] now has disclosed the purpose of this language, and that is why I am combating it, and for the best of reasons, I think. I do not want to make a resident of California come to Trenton, N. J., to bring a suit for violation of this law, but I want him to sue at home in the jurisdiction where the cause of action arose." *Id.* 9416. See also *id.* 9466–9467, 9607–9608, 9663–9664.

[23] *E. g.,* Representative Floyd stated that the provisions were designed "to give the Government the widest possible scope in getting service in these cases, and the provision is right as it is written and ought not to be changed." *Id.* 9416.

[24] "Mr. Floyd. . . . The very broadest language that can be used in a statute of this kind conferring jurisdiction is to give the jurisdiction where the corporation resides or is found." *Id.* 9415. And "I think the provisions relating to service properly drafted as they appear in the bill, and that the proposed amendment and others suggested in the debate would narrow the scope of the provisions as drawn." *Id.* 9417. And see *id.* 9608.

ward, as well as over various formulations of the proposed addition. Some were broader than was necessary to achieve the primary aim.[25] Indeed some were so broad that committee members thought their inclusion would jeopardize passage of the entire bill.[26]

To avoid this result and to satisfy those who insisted on amendment, the committee yielded and proposed a substitute amendment for one of those offered from the floor relating to § 4. The committee substitute added the words "or has an agent" after "is found" in the original committee version. 51 Cong. Rec. 9466. This amendment passed the House and later the Senate unchanged. *Id.* 9467. Section 4 thus became law in its present form, for the limited class of cases covered by its terms. Cf. note 18.

Since however the amendment affected only § 4, the problem concerning § 12 remained unresolved. Suggestions therefore were made at once for amending § 12 to bring it into conformity with § 4. *Id.* 9467, 9607. Although other proposals were again put forward, *id.* 9607, the conforming amendment was adopted by the House. *Ibid.*

After the bill passed the House, it was referred to the Senate Committee on the Judiciary. That committee reported it out with § 12 altered by the substitution of "or transacts business" in place of "or has an agent,"

---

[25] See, *e. g.*, Representative Cullop's suggestion to confer jurisdiction on state courts without a right of removal to the federal courts. *Id.* 9662–9664.

[26] In opposing the suggestion to confer jurisdiction on the state courts, Representative Floyd argued, *inter alia*, that "any friend of this legislation, as I am sure the gentleman from Indiana [Representative Cullop] is, ought not to aid those who are fighting this legislation—the trusts and the combines of this country—by loading it down with questionable amendments that will tend to defeat it and destroy it in the end." *Id.* 9663.

but leaving the latter clause in § 4 untouched.[27]   The Senate committee reports and the debates in that body throw little light upon the reasons underlying the committee's alteration of § 12 and its failure to alter § 4 so as to make them uniform, except for the general statement that § 12 as reported "concerns the venue or the place where suits to enforce the antitrust laws against corporations may be brought and liberalizes the Sherman law to some extent upon this subject."[28]   The bill finally passed the Senate with § 12 substantially as it was reported by the Committee on the Judiciary,[29] and went to conference in that form.   In conference the Senate version of § 12 prevailed over that of the House, and the bill was so enacted.[30]

The short outcome was that Congress expanded the venue provisions of the Sherman Act, § 7, in two ways, *viz:* (1) by adding to "resides or is found," in § 4 of the Clayton Act, the words "or has an agent"; (2) in § 12 by adding "or transacts business."   Thus strict uniformity in the two sections' venue provisions was not achieved. But whatever their differences may be, each addition was designed to aid plaintiffs by giving them a wider choice of venues, and thereby to secure a more effective, because more convenient, enforcement of antitrust prohibitions.

Moreover the discussions in Congress, particularly in the House, disclose no other thought than that the choice

---

[27] In place of the House amendment to § 12 of "or has an agent," the Senate committee substituted this language: "or transacts any business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."   Sen. Rep. No. 698, 63d Cong., 2d Sess. 73.

[28] 51 Cong. Rec. 14214.   See *id.* 14596, 15943, 16048–16052.

[29] An amendment providing for stockholder suits against officers of a corporation violating the antitrust laws was added by the Senate but deleted in conference.   See the references cited in note 28.

[30] Sen. Doc. No. 583, 63d Cong., 2d Sess. 9.   Sen. Doc. No. 584, 63d Cong., 2d Sess. 18.

of forums was given as a matter of right, not as one limited by judicial discretion. There was, in fact, common agreement upon this among both the advocates and the opponents of amendment.[31] No one suggested that the courts would have discretionary power to decline to exercise the jurisdiction conferred. But since it was universally agreed that the choice of venue, to whatever extent it might be conferred, was to be given as a matter of right, several of the broader amendments were opposed and defeated as going too far.[32]

Congress therefore was not indifferent to possibilities of abuse involved in the various proposals for change. Exactly the opposite was true. For the broader proposals were not rejected because they gave the plaintiff

---

[31] See notes 25, 26. The following are examples of the discussion on the plaintiff's right to choose: "Mr. DICKINSON. . . . I do not ask to strike out any language of the committee, but simply to add to it, to make clear and definite and certain so that any person and any corporation may be sued not only where it has its residence as a corporation or individual, but that it can be sued wherever it is found doing business and the cause of action may arise.

"Mr. STEPHENS of Texas. . . . I thoroughly agree . . . ." 51 Cong. Rec. 9414.

"I will say to my friend from Wisconsin [Mr. Stafford] that we are liberalizing the procedure in the courts in order to give the individual who is damaged the right to get his damages anywhere— anywhere you can catch the offender, as is suggested by a friend sitting near by." The quoted language is that of Representative Webb. 51 Cong. Rec. 16274. See id. 9467, 9607; also note 32.

[32] Mr. SCOTT. I could not conceive that anything would deprive the plaintiff of his right to choose the place of trial if he so desired, either in the district where found or where the corporation resides." Id. 9417.

"Mr. SCOTT. . . . The amendment enlarges the present interpretation of the word 'found' as applied to the corporate jurisdiction, and permits suit to be brought, *with absolute discretion on the part of the plaintiff,* in any district in which the defendant may have an agent, without defining the character of that agent." (Emphasis added.) Id. 9467.

the choice. They were rejected because the choice given was too wide, giving plaintiffs the power to bring suit and force trial in districts far removed from the places where the company was incorporated, had its headquarters, or carried on its business. In adopting § 12 Congress was not willing to give plaintiffs free rein to haul defendants hither and yon at their caprice. 51 Cong. Rec. 9466, 9467. But neither was it willing to allow defendants to hamper or defeat effective enforcement by claiming immunity to suit in the districts where by a course of conduct they had violated the Act with the resulting outlawed consequences. In framing § 12 to include those districts at the plaintiffs' election, Congress thus had in mind not only their convenience but also the defendant company's inconvenience, and fixed the limits within which each could claim advantage in venue and beyond which neither could seek it. Moreover, in § 12, though not in § 4, the right of choice conferred was given designedly to the Government as well as to private suitors.[33]

In the face of this history we cannot say that room was left for judicial discretion to apply the doctrine of *forum non conveniens* so as to deprive the plaintiff of the choice given by the section. That result, as other courts have concluded, would be utterly inconsistent with the purpose of Congress in conferring the broader range of choice. *Tivoli Realty* v. *Interstate Circuit*, 167 F. 2d 155; *Ferguson* v. *Ford Motor Co.*, 77 F. Supp. 425.

In this view of Congress' action, numerous considerations of policy urged by the appellees as supporting the discretionary power's existence and applicability become irrelevant. Congress' mandate regarding venue and the

---

[33] Representative Floyd remarked that the committee "language was used to make this section conform to the existing law and enable him [the Attorney General] to have greater liberty in bringing these suits." *Id.* 9415. And see note 23 *supra*.

exercise of jurisdiction is binding upon the federal courts. Const. Art. III, § 2. Our general power to supervise the administration of justice in the federal courts, cf. *McNabb* v. *United States,* 318 U. S. 332, does not extend to disregarding a validly enacted and applicable statute or permitting departure from it, even in such matters as venue.

It is true that the appellees made a strong showing of inconvenience, albeit by interested persons, when that matter is considered on their presentation alone. On the other hand, the Government advanced strong reasons, apart from the question of power, for not applying the doctrine.[34] But in the view we take of § 12, we need not consider whether the appellees' showing on the facts sufficiently outweighed that of the Government to justify dismissal.[35]

Two important policy considerations were advanced by the Government, however, which not only bear strongly upon that question but affect the question of power, if Congress had not concluded it. The first is that permitting the application of *forum non conveniens* to antitrust cases inevitably would lengthen litigation already overextended in the time required for its final disposition, and thus would violate Congress' declared policy of expediting this type of litigation.[36]

---

[34] See notes 6 and 7.

[35] It should be noted, however, that "the mere balance of convenience" in favor of defendants would be insufficient to justify application of the doctrine of *forum non conveniens.* This has been true since the earliest Scottish and English cases applying the doctrine, although the test has been variously formulated. For example, dismissal has been authorized if suit is "vexatious and oppressive and an abuse of the process of the Court," or "only brought to annoy the defendant." See Braucher, The Inconvenient Federal Forum, 60 Harv. L. Rev. 908, 909–911. Cf. also note 16 *supra.*

[36] Congress has provided that the trial of these actions may, upon request of the Attorney General, "be given precedence over others

The argument has merit to support the conclusion we have reached upon the statute. Antitrust suits, even with all the expedition afforded them, are notoriously though often perhaps unavoidably long drawn out. The more complex and important cases seldom require less than three to five years to conclude,[37] except possibly where consent decrees are entered. Often the time necessary or taken is much longer. To inject into this overlengthened procedure what would amount to an additional preliminary trial and review upon the convenience of the forum could not but add approximately another year or longer to the time essential for disposing of the cases, indeed for reaching the merits.[38] Although some instances of inconvenience to defendants will arise from the absence of discretionary power, that will be unavoidably true in almost any event. And it may well be doubted

and in every way expedited, and be assigned for hearing at the earliest practicable day . . . ." 32 Stat. 823, 15 U. S. C. § 28. The policy of expediting final decision of these cases is further implemented by authorizing direct appeals to this Court. 32 Stat. 823, 15 U. S. C. § 29.

[37] See, e. g., Schine Theatres v. United States, 334 U. S. 110; United States v. Griffith, 334 U. S. 100, which were instituted in 1939 and have recently been remanded for further proceedings in the trial courts. And the Eastman case, 273 U. S. 359, though begun in 1915, was not decided by this Court until 1927.

[38] In this case, although the proceedings have advanced without unwarranted delay at any one stage, more than a year has been consumed solely on the issue of forum non conveniens. The complaint was filed on April 10, 1947. Motions to dismiss, supported by affidavits to show inconvenience, were filed in August and September. The trial court made findings and entered judgment of dismissal on October 15 and allowed an appeal on December 3. The Government filed its statement as to jurisdiction in this Court on January 20, 1948; we noted probable jurisdiction on February 9, heard oral argument on April 28, and today we resolve the issue. But for the intervention of the motions, the consequent dismissal and appeal, the case with appropriate expedition might now be well on the way to final decision on the merits.

that the sum total of inconvenience and injustice resulting will be as great as would follow, for both private plaintiffs and the public, from allowing the inescapable delay incident to the exercise of such a discretionary power. For once the power were found to exist, it is more than likely that injection of the issue would become a common incident of antitrust suits, and create the disadvantage of delay for all concerned.

This consideration is reinforced by another, namely, the difficulty of applying the doctrine in cases such as this, in which the violations charged are nationwide or nearly so in scope and effect, and the defendants are numerous companies widely scattered in the location of their places of incorporation, principal offices, and places of carrying on business and participating in the scheme. In such a case dismissal in one authorized district cannot reinstate or transfer the cause to another. Nor can the court, within the limits of the doctrine, specify the district in which the case shall be reinstituted and tried. It can only terminate the pending proceeding, as was done here, without prejudice to commencement of a like suit "in a more appropriate or convenient forum," with whatever consequences may follow from having to begin all over again.

Further, when that is done, the result well may be in some instances to have the action commenced again, only to precipitate the same issue and consequent delay in the second forum. Conceivably this could occur from forum to forum in succession, depending upon the number of corporations named as defendants and the variety, proximity, and degree of concentration of the locations of their principal offices, places of business, and the relative advantages of other available forums for the variously situated defendants. Accordingly, in an unknown number of such cases the practical result well might be to establish a merry-go-round of litigation upon the

issue, which could be used to defer indefinitely consideration of the merits. The very possibility of such a tactic would greatly hamper the institution as well as the conclusion of antitrust proceedings. Indeed, for cases of this complex type, the uncertainty concerning the outcome of an effort to apply the doctrine might go far toward defeating the Act's effective application to the most serious and widespread offenses and offenders.[39]

Further, even if it is taken that the appellees' activities constituting the core of the violations charged were as fully concentrated in or near the Illinois district as appellees claim, such a concentration might or might not exist in other like proceedings. And in the latter event the problem of selecting the appropriate forum well might become a highly uncertain and difficult one.[40]

---

[39] In this case these possibilities have been discounted, largely upon the basis that the appellees had joined in stipulating that all regarded the Illinois forum "as the proper forum for the above action" and that, in case of dismissal in the California district and filing of a like suit in the Illinois district, the defendants would not move for dismissal of the new suit on the ground of *forum non conveniens*. The stipulation perhaps would be effective in this case to avoid the complexities of repeated motions if suit were reinstituted in Chicago, but not if the Government should select any of the other venues open to it under § 12.

In any event, the stipulation is wholly irrelevant to any question of the general effect of the doctrine's applicability upon antitrust proceedings. For once that were established, no defendant or group of defendants in subsequent cases would be bound, or perhaps likely, to execute such a stipulation.

[40] As the Government points out, in practically all of the more complex types of antitrust proceedings, the principal defendants are corporations doing a multistate business, and the combination or conspiracy charged seldom has a defined locus. In such situations, it is generally true that, whatever the forum chosen by the plaintiff, it will be inconvenient for some of the defendants and often for most of them. When there is such diffusion of possible venue, that fact of course would be basis for declining to apply the

The appellees also strongly urge two other considerations which deserve mention. One is that a criminal prosecution against the appellees (together with seven individuals, officers of some of them), pending in the California district simultaneously with this cause and growing out of substantially the same transactions, had been transferred to the Illinois district shortly before the District Court entered its judgment of dismissal.[41] The transfer was ordered pursuant to Rule 21 (b) of the Federal Rules of Criminal Procedure.[42] That action was taken after

doctrine of *forum non conveniens*, even if applicable. It is also reason for declining to accept the view that the doctrine was intended to be applicable.

Thus, in this case, all but two of the appellees were incorporated and hence "reside" in Delaware. None are incorporated in Illinois, and only two have their principal places of business or headquarters in Chicago. The invariable practice for fifty-four years, first under § 7, then under § 12, has been that suit may be maintained and trial had at the plaintiff's election where the corporation "resides" or where it "is found." But if this suit had been brought in Delaware or at any of the principal places of business except Chicago, under the application of *forum non conveniens* made here the trial could not have proceeded in any of those other places. Cf. *Tivoli Realty* v. *Interstate Circuit*, 167 F. 2d 155. The statute, § 12, does not require trial to be had where the agreement in conspiracy takes place. Locus of coming to agreement is not the gist of the offenses proscribed.

[41] The indictment was returned on April 9, 1947; on August 14, 1947, defendants' motion to transfer the cause was granted. The civil complaint was filed on April 10, 1947, and dismissed on October 15, 1947.

[42] Rule 21 (b) provides: "OFFENSE COMMITTED IN TWO OR MORE DISTRICTS OR DIVISIONS. The Court upon motion of the defendant shall transfer the proceeding as to him to another district or division, if it appears from the indictment or information or from a bill of particulars that the offense was committed in more than one district or division and if the court is satisfied that in the interest of justice the proceeding should be transferred to another district or division in which the commission of the offense is charged." Cf. note 43 and

the District Court had made findings of fact and conclusions of law founded upon and substantially adopting the appellees' showing, which was practically identical with their showing in this case. Consequently, as the cases now stand, the criminal cause is to be tried in the Illinois district while this civil suit founded upon practically the same transactions and affecting the same corporate defendants is to be tried in the California district.

Great emphasis is placed upon this as an impelling reason for holding *forum non conveniens* applicable here, and then sustaining the order of dismissal under that doctrine and the District Court's findings. But, for the reasons above stated, we think the matter has been concluded by the terms and intent of § 12. Moreover, it is at least doubtful whether the Government had a right to appeal from the order of transfer in the criminal case.[43] In any event, the validity of that order is not before us. We therefore express no opinion upon either of those questions. But the fact that we cannot do so goes far to nullify the effect of appellee's argument of hardship arising from the transfer. For that argument comes down, in the peculiar circumstances, to one that because the District Court on appellees' application has

---

text. In addition to the questions there reserved, we express no opinion on whether Rule 21 (b) applies to criminal antitrust prosecutions.

The Federal Rules of Criminal Procedure became effective March 21, 1946. It would be stretching very far the idea of utilizing legislative history, if criminal rules adopted twenty-two years after a civil statute was enacted were given any significance upon the meaning or effect of the statute.

[43] The precise point apparently has not arisen since the adoption of Rule 21 (b), but there would seem to be no statutory basis for appeal from an order of this type. See 18 U. S. C. § 682. See also *Semel* v. *United States*, 158 F. 2d 231, 232.

transferred the criminal cause by a dubiously reviewable order, perforce of that action it should also dismiss this civil cause and we should sustain the dismissal.

In practical effect the outcome of accepting such an argument as ground for sustaining both the power and the dismissal would be to make Rule 21 (b) controlling in civil as well as criminal cases involving the same transactions and parties, thus overriding § 12, and at the same time depriving the plaintiff in the civil cause of anything more than perfunctory review of the District Court's order of dismissal.[44]

Hardly can it be taken that Rule 21 (b) was intended so to override the provisions of § 12, to confer power on the District Courts to do so, or to nullify the plaintiff's right of appeal from an order depriving it of the statutory privilege of choosing the venue. Yet these would be the practical results, if the consideration that the court has ordered transfer of the criminal case is to be controlling or highly influential, as it undoubtedly would be in most cases, in applying the doctrine of *forum non conveniens* in the civil cause. If matters of policy were material, these possible consequences would add force to the view that the doctrine is not applicable.

Moreover, if the transfer should result in hardship to the appellees,[45] insofar as the hardship arises from that

---

[44] All that defendants would have to do, in any practical sense, in order to secure dismissal, would be to convince the District Court that transfer of the criminal cause should be made, and then demonstrate the self-evident fact that trial of the two causes in different districts would be inconvenient.

[45] In view of our decision in this civil case, there would be nothing to prevent appellees from making a motion under Rule 21 (b) of the Criminal Rules to have the criminal cause retransferred to the Southern District of California, if in the changed outlook arising from this decision that should be their pleasure.

The Government argues further that as a practical matter there

cause it is one which was avoidable by them and will be incurred as a result of their own action in applying for it. That they have voluntarily incurred it is no good reason for depriving the plaintiff of its statutory right of choice under the terms and policy of § 12 in the entirely distinct civil suit.

Finally, both appellees and the District Court have placed much emphasis upon this Court's recent decisions applying the doctrine of *forum non conveniens* and in some instances extending the scope of its application.[46] Whatever may be the scope of its previous application or of its appropriate extension, the doctrine is not a principle of universal applicability, as those decisions uniformly recognize. At least one invariable, limiting principle may be stated. It is that whenever Congress has vested courts with jurisdiction to hear and determine causes and has

---

is little likelihood that appellees will be forced to defend both actions. For its distinctly footnote value we quote from its brief:

"When the Government believes that there has been a violation of the Sherman Act, it sometimes seeks corrective relief by way of a civil suit filed after, or simultaneously with, the return of a criminal indictment, but when companion proceedings are thus instituted it is only rarely that both are ultimately brought to trial. If it is held on the present appeal that dismissal of the civil complaint was erroneous, the Government will not seek to bring the criminal and the civil cases to trial simultaneously and, in any event, it is highly unlikely that it will be found necessary to bring both cases to trial.

"If the Government obtains a decree in a civil suit, the defendants in a related criminal case usually file pleas of *nolo contendere*. If the criminal case is tried first and verdicts of guilty are returned, there is nothing left for trial in the civil case except the question of relief (*Local 167* v. *United States*, 291 U. S. 293, 298–299), and the parties are customarily able to reach an agreement on this question and dispose of the civil case by the entry of a consent decree."

[46] *Gulf Oil Corp.* v. *Gilbert*, 330 U. S. 501; *Koster* v. *Lumbermens Mutual Co.*, 330 U. S. 518. See also *Baltimore & Ohio R. Co.* v. *Kepner*, 314 U. S. 44; *Miles* v. *Illinois Central R. Co.*, 315 U. S. 698; *Williams* v. *Green Bay & W. R. Co.*, 326 U. S. 549.

invested complaining litigants with a right of choice among them which is inconsistent with the exercise by those courts of discretionary power to defeat the choice so made, the doctrine can have no effect. *Baltimore & O. R. Co.* v. *Kepner,* 314 U. S. 44; *Miles* v. *Illinois Central R. Co.,* 315 U. S. 698. The question whether such a right has been given is usually the crux of the problem. It is one not to be answered by such indecisive inquiries as whether the venue or jurisdictional statute is labeled a "special" or a "general" one. Nor is it to be determined merely by the court's view that applicability of the doctrine would serve the ends of justice in the particular case. It is rather to be decided, upon consideration of all the relevant materials, by whether the legislative purpose and the effect of the language used to achieve it were to vest the power of choice in the plaintiff or to confer power upon the courts to qualify his selection.

This is a case in which the pertinent factors make clear that the courts were given no such power. Accordingly the judgment is

*Reversed.*

MR. JUSTICE JACKSON, concurring.

I agree with the conclusion of the Court but arrive at it by a shorter and different route.

We have just had occasion to review and to decide, by a divided Court, cases involving the doctrine of *forum non conveniens. Gulf Oil Corp.* v. *Gilbert,* 330 U. S. 501; *Koster* v. *Lumbermens Mutual Casualty Co.,* 330 U. S. 518. We there held that, in cases where the plaintiff was in court in an ordinary civil suit only by reason of the venue statutes that apply generally, the court could exercise discretion in dismissing complaints to prevent imposition on its jurisdiction if the circumstances of the particular case showed an abuse of the option vested in

plaintiff by the general venue statutes. But we also pointed out that, where the choice of forum was authorized by a special venue statute, this discretion to dismiss would not be implied. The distinctions there made between general and special venue statutes may have been overly simple from the viewpoint of the dialectician. But as working tools of everyday craftsmen they do serve to point out a difference that I think governs here.

Congress made some rather unusual provisions as to venue in antitrust cases. Had it stopped there, it might have been permissible for the courts to devise their own limitations to prevent abuse of their process. But Congress did not stop there. Not only once but three times it has enacted almost identical provisions which check any abuse or oppression from compelling defendants to defend in places remote from their habitat. 15 U. S. C. § 5 (1890), 15 U. S. C. § 10 (1894), 15 U. S. C. § 25 (1914).

The scheme of the statutes, as I see it, is that the Attorney General may lay the venue in any district where he may properly serve one or more of his defendants. He may go ahead with his action against them, whether he is allowed to bring in others or not. Before he can bring in other parties than those properly served in the district, i. e., those "inhabitant," "transacting business," or "found" there, it must be made to appear to the court that the ends of justice require that they be brought before the court, in which case they may be summoned from any district.

Congress has here provided a practice by which any defendant, who has not subjected himself to suit in the district, may obtain the same protections which the *forum non conveniens* doctrine would afford.

In this case, the defendants, who might be entitled to urge the doctrine, have not resisted or contested the

order bringing them into the suit. It was by so doing that they could have shown that the ends of justice would not be served by such action. Instead, they desire to submit to being brought in and then use their position to throw the whole case out. This, I think, cannot be done.

The special provision Congress has made, both to establish venue and to protect against its abuse, whether the exact equivalent of *forum non conveniens* or not, seems to me to preclude its application by the courts to this class of cases.

For this reason I concur in the result.

MR. JUSTICE FRANKFURTER, dissenting.

This is an equity suit for violation of §§ 1 and 2 of the Sherman Law brought in the United States District Court for the Southern District of California. The same defendants were indicted in the same court for the same transactions under the criminal provisions of the Sherman Law. That court transferred the criminal proceedings from the Southern District of California to the District Court for the Northern District of Illinois because it was "in the interest of justice" to order the transfer. In doing so, the court below was obedient to Rule 21 (b)[1] of the Federal Rules of Criminal Procedure, formulated by this Court and having the force of law. 327 U. S. 823 *et seq.* With convincing particularity the District

---

[1] "The court upon motion of the defendant shall transfer the proceeding as to him to another district or division, if it appears from the indictment or information or from a bill of particulars that the offense was committed in more than one district or division and if the court is satisfied that in the interest of justice the proceeding should be transferred to another district or division in which the commission of the offense is charged."

Court set forth its reasons for making this transfer.[2] After the transfer of the criminal case, the court granted the motion now before us, dismissing the equity suit "in the interest of justice, just as the same facts in the companion criminal prosecution required its transfer to another district." 7 F. R. D. 456, 465.

Is it not incongruous that that which "the interest of justice" demanded in the criminal prosecution is beyond the power of a court in a civil suit against the same defendants on the same transactions?[3]

Of course Congress may leave no choice to a court to entertain a suit even though it is vexatious and oppressive for the plaintiff to choose the particular district in which he pursues his claim. But such limitation upon the power of courts to administer justice ought not to be lightly drawn from language merely conferring jurisdiction. The manner in which jurisdictional provisions are appropriately to be read is illustrated by our decision in *Massachusetts* v. *Missouri,* 308 U. S. 1, where this Court recognized "considerations of convenience, efficiency and justice" even when a State invoked the Court's original jurisdiction in what was concededly a justiciable controversy. 308 U. S. at 19. I do not find in the

[2] "I do not question the motive of the Government in instituting the prosecution in this district.

"But I am satisfied that a trial here would impose unnecessary hardships on the defendants and entail unjustifiable expense which it is the object of the new rules of criminal procedure, and especially of the rule under discussion, to avoid. Altogether the facts spell out the vexatiousness and oppressiveness which the Supreme Court has warned us to eschew in matters of this character." 7 F. R. D. 393, 402–403.

[3] Cf. L. Hand, J., in *United States* v. *Aluminum Co. of America,* 148 F. 2d 416, 429: "In United States v. Hutcheson, 312 U. S. 219, 61 S. Ct. 463, 85 L. Ed. 788, a later statute in pari materia was considered to throw a cross light upon the Anti-trust Acts, illuminating enough even to override an earlier ruling of the court."

scheme of the anti-trust acts and of their relevant legislative history the duty to exercise jurisdiction so imperative as to preclude judicial discretion in refusing to entertain a suit where "the interest of justice" commands it.

Defendants in an anti-trust suit may no doubt attempt to resort to delaying tactics by motions claiming unfairness of a particular forum. Neither must we be indifferent to the potentialities of unfairness in giving the Government a wholly free hand in selecting its forum so long as technical requirements of venue are met. See, *e. g., The Railway Shopmen's Strike Case (United States* v. *Railway Employees),* 283 F. 479. All parties to a litigation tend to become partisans, and confidence in the fair administration of justice had better be rested on exacting standards in the quality of the federal judiciary. Federal judges ought to be of a calibre to be able to thwart obstructive tactics by defendants and not be denied all power to check attempted unfairness by a too zealous Government.

I find nothing in the anti-trust acts comparable to the considerations which led this Court to conclude that the provisions of the Federal Employers' Liability Act were designed to give railroad employees a privileged position in bringing suits under that Act. See, especially, concurring opinion in *Miles* v. *Illinois Cent. R. Co.,* 315 U. S. 698, 705.

I am of opinion that the District Court had power to entertain the motion on the basis of which it entered the judgment.

Mr. Justice Burton joins this dissent.