In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3406

KM ENTERPRISES, INC.,

*Plaintiff-Appellant*,

*v.*

GLOBAL TRAFFIC TECHNOLOGIES, INC.
and GLOBAL TRAFFIC TECHNOLOGIES, LLC,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 12-CV-257 — **Michael J. Reagan**, *Judge*.

ARGUED FEBRUARY 15, 2013 — DECIDED AUGUST 2, 2013

Before FLAUM, WOOD, and HAMILTON, *Circuit Judges*.

WOOD, *Circuit Judge*. KM Enterprises, Inc. (KME), an Illinois corporation, sued Global Traffic Technologies, Inc. and its subsidiary, Global Traffic Technologies, LLC (collectively GTT), both Delaware entities headquartered in Minnesota, in the Southern District of Illinois, alleging violations of the Sherman and Clayton Acts and related state laws. The district court dismissed the suit for improper

venue, reasoning that GTT did not reside in the district and that none of the events at issue in the suit took place there.

KME's appeal of that dismissal raises a surprisingly complex question about the relation between general principles of personal jurisdiction and venue and the special jurisdiction and venue provisions that appear in the Clayton Act. For the reasons that follow, we affirm the judgment of the district court.

## I

KME and GTT are competitors in a specialized market for devices that permit emergency vehicles to send a signal that preempts ordinary traffic lights and thereby allows the emergency vehicle to pass through an intersection with, rather than against, the light. This speeds the progress of the emergency vehicle and enhances safety for other vehicles. There are at least two primary traffic-signal-interrupter technologies, one that relies on optical signals and one that uses GPS signals. GTT's optical products carry the brand name "Opticom."

This case is but one of several ongoing legal disputes between KME and GTT. In 2010, GTT filed a patent infringement suit against KME in the District of Minnesota; KME then filed a separate suit against GTT, also in the District of Minnesota, which was consolidated with the patent case. Next, KME sued the New York State Department of Transportation and its commissioner twice in 2011 in the Eastern District of New York, challenging the Department's award of traffic-preemption contracts to vendors of GTT technology. KME followed with this suit in the Southern District of Illinois in 2012. The present suit

alleges that GTT violated federal antitrust laws by improperly interfering with competitive bidding on public contracts and engaging in monopolistic activity similar to illegal tying.

KME alleges that GTT improperly persuades public agencies to specify GTT's Opticom technology when drafting their public contract requirements, thus ensuring that such contracts are awarded to bidders who will install GTT's units. But the plot thickens. KME further alleges that GTT then falsely informs these agencies that the Opticom product is no longer available and instead offers to supply a "dual" unit that houses both optical and GPS technology. Apparently the theory is that this is a type of bait-and-switch, or that some other aspect of the arrangement has the effect of locking the purchasers into GTT's GPS technology and harming competition in the GPS market. Notably, none of this illegal tying activity took place in Illinois. Though there are several dozen GTT-equipped traffic intersections located in the Southern District of Illinois (and some unspecified number of additional intersections in the state as a whole), none is equipped with the dual unit at the core of KME's antitrust allegations.

Shortly after the present suit was filed, GTT moved to dismiss based on, among other things, improper venue. Discovery and a hearing on the motion revealed that, other than the GTT devices at the intersections in the district, GTT's presence in the Southern District of Illinois was limited to six direct sales to buyers in the district over a four-year period, totaling $2,327.25, or .002% of GTT's sales, and two meetings between GTT and KME representatives in the district during which GTT offered to purchase KME's

business. In addition, there are third-party contractors who bid on contracts in the district and install GTT's equipment. It was undisputed that GTT does not directly install or maintain the equipment in the district, does not maintain offices or agents in the district, and does not directly promote its products in the district. The public procurement process by which traffic-signal-interrupter contracts are awarded takes place in Springfield, while the third-party distributor that supplies GTT's products to the district is located in Chicago. Based on these facts, the district court granted GTT's motion to dismiss on venue grounds, reasoning that GTT's contacts with the district could not support venue under 28 U.S.C. § 1391.

KME appeals. It challenges the district court's determination that GTT's contacts with the district are insufficient to support venue under the general venue statute, Section 1391, and it argues that venue is proper under Section 12 of the Clayton Act, which provides special rules for venue and service of process in antitrust actions against corporations. 15 U.S.C. § 22. (We note that only one of the GTT entities is a corporation (GTT, Inc.), and the other is an LLC. By analogy to the union (an unincorporated association) at issue in *Denver & Rio Grande Western Railroad v. Brotherhood of Railroad Trainmen*, 387 U.S. 556 (1967), it seems that venue for the LLC should be determined by the residence of the entity itself rather than that of its individual members. See *id.* at 559. Given the existence in this case of the corporate defendant, however, we need not delve further into that issue.) More importantly, KME advances a theory that would allow it to short-circuit the venue analysis by mixing and matching among the service-of-process and venue provisions of Section 12 and Section 1391. The latter

theory is a controversial one that has divided our sister circuits. Because our disposition of this appeal hinges on whether we adopt it, we address it first.

## II

The intersection between general principles of federal personal jurisdiction and venue and the Clayton Act's specific provisions has become tangled over the years. It is helpful, therefore, to begin with a review of the relevant procedural principles and the language of the governing statutes. "Personal jurisdiction" refers to the court's power over the parties. See *Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979). That power derives ultimately from the state (in the general sense of the term), the party's contacts with the state, and the reasonableness of the assertion of judicial authority, but the mechanics for asserting personal jurisdiction in federal court are found in Federal Rule of Civil Procedure 4(k). Subpart (1)(A) of the rule provides that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant … who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." This means, in essence, that federal personal jurisdiction is proper whenever the person would be amenable to suit under the laws of the state in which the federal court sits (typically under a state long-arm statute), subject always to the constitutional due process limitations encapsulated in the familiar "minimum contacts" test. See *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); see also, *e.g.*, *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Hous. Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010). Subpart (1)(C) provides that personal jurisdiction is proper if

authorized by a federal statute, again subject to due process limitations.

While personal jurisdiction governs a court's power over a defendant, federal venue rules determine in which judicial district (among those that have the power to hear a given suit) a suit should be heard. *Leroy*, 443 U.S. at 180. Unlike personal jurisdiction, which has a constitutional dimension, civil venue is a creature of statute, intended to limit the potential districts where one may be called upon to defend oneself in any given matter to those that are fair and reasonably convenient. *Id.* The general federal venue statute, 28 U.S.C. § 1391, provides that venue in a civil case is proper in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
>
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). (Section 1391 was amended by the Federal Courts Jurisdiction and Venue Act of 2011, Pub. L. No. 112-63. The Act eliminated a longstanding distinction between venue in civil cases brought under federal question jurisdiction and those brought under diversity jurisdiction

and rearranged several subsections. While the Act's amendments, which became effective in January 2012, apply to this case, they have no substantive effect on our analysis. Because we apply the Act as amended, however, the subsections to which we refer are numbered slightly differently than they were when courts addressed this topic previously.) The statute further provides that a corporate defendant is deemed to "reside" "in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." § 1391(c)(2). In states with multiple judicial districts, subsection (d) limits the residency of a corporation to "any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there is no such district … in the district within which it has the most significant contacts."

These are the rules that govern in the general case. But, as Rule 4(k)(1)(C) recognizes, in some instances Congress has provided special federal rules for establishing personal jurisdiction, venue, or both. The Clayton Act is one such statute. Section 12 states:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

15 U.S.C. § 22. As we can see, Section 12 provides for both personal jurisdiction and venue in the case of a corporate

defendant. Its first clause sets venue anywhere the corporation is an "inhabitant," is "found," or "transacts business," while the second clause provides for nationwide (indeed, worldwide) service of process and therefore nationwide personal jurisdiction. See, *e.g.*, *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 449 (6th Cir. 2012); *GTE New Media Servs., Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1350 (D.C. Cir. 2000); see also *Go-Video, Inc. v. Akai Elec. Co.*, 885 F.2d 1406, 1413 (9th Cir. 1989) (worldwide service authorized from standpoint of U.S. law).

The structure of Section 12 raises a question, however: must its venue and service-of-process provisions be read as an integrated whole? That is, if a plaintiff chooses to take advantage of Section 12's nationwide service-of-process provision (and thus in effect rely on nationwide personal jurisdiction), must she then establish venue under Section 12 as well, or may she mix and match, relying on the Clayton Act for personal jurisdiction and Section 1391 for venue? The answer is far from clear, and the confusion appears to stem from the phrase "in such cases" in the second clause. Does "such cases" refer to any antitrust suit against a corporation, or only to those antitrust cases against corporations for which the venue rules in Section 12 are satisfied? The Supreme Court has yet to speak on the issue. While the Court has held that special venue rules may, as a general matter, be supplemented by the general venue provisions, provided that the statute does not indicate a contrary congressional intent, *Pure Oil Co. v. Suarez*, 384 U.S. 202, 204-05 (1966); see also *Bd. of Cnty. Comm'rs v. Wilshire Oil Co.*, 523 F.2d 125, 130-31 (10th Cir. 1975) (Section 12 contains no contrary intent and may be supplemented), this tells us only that Section 12 venue is not exclusive of Section 1391. It

sheds no light on whether Section 12 itself is a package deal or an à la carte menu.

Before delving into the competing views on whether the clauses of Section 12 are or are not linked, we should explain why the answer matters. If the clauses are read together, then there exist some limits on where a corporate antitrust defendant may be sued. Though personal jurisdiction is appropriate everywhere under that statute, venue is proper only in the district(s) the corporation inhabits, is found, or transacts business. A corporation inhabits the district in which it is incorporated. See, *e.g.*, *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 293 n.6 (3d Cir. 2004). Being found and transacting business both refer to a corporation's activities in the district, with the latter concept interpreted more expansively than the former. *Id.* Section 12 is not a restrictive venue provision. Indeed, for much of its history, it has been more generous than the general venue statute, at least in the case of out-of-state domestic corporations, see *Gen. Elec. Co. v. Bucyrus-Erie Co.*, 550 F. Supp. 1037, 1041 (S.D.N.Y. 1982), but it falls well short of providing universal venue in every judicial district in the United States.

The same cannot be said if we decouple Section 12's clauses and enable a plaintiff to combine nationwide service of process with Section 1391. As noted above, Section 1391(b)(1) states that venue is proper in any district where the defendant "resides" (provided all defendants reside in the same state), while subsection (c)(2) provides that a corporation resides in any district in which it is subject to personal jurisdiction. But if the plaintiff relies on the Clayton Act's nationwide service of process to secure personal jurisdiction, then for purposes of Section 1391 the corporate

defendant would "reside" in every judicial district in the country and venue would be proper everywhere. Although Section 1391(c)(2) places some restrictions on venue in the typical case (since most corporations are not subject to personal jurisdiction everywhere in the United States), the result of combining it with Section 12 is that it imposes no limits whatsoever in an antitrust suit. (As a brief aside, the result is similar in the case of alien corporations. Section 1391(c)(3) provides that in a suit against an alien, venue is proper in any district. Thus, if a plaintiff could combine Section 12 service of process with Section 1391 venue, it could drag an alien into court anywhere in the United States. See, *e.g.*, 14D CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 3818 (3d ed. 2013) [hereinafter WRIGHT & MILLER].)

The effect of combining Section 12 service of process with Section 1391 venue is more complicated when a plaintiff sues in a state, such as Illinois, that has more than one judicial district. In those cases, Section 1391(d) directs the court to choose among the districts in the state by looking to whether the corporate defendant's *contacts* with the district would subject it to personal jurisdiction if the district were a single state. What are we to make of this instruction? According to one understanding, we could interpret this language to require that a court perform the standard minimum contacts analysis used for personal jurisdiction for purposes of setting venue, even though that analysis was not required to establish personal jurisdiction at the state level in the first place. Another possibility (albeit one that has the flaw of making some words in the statute superfluous) is to ignore the suggestion in subsection (d)'s reference to "contacts" and find that since the Clayton Act subjects a

corporate defendant to personal jurisdiction throughout the United States, that defendant would be subject to personal jurisdiction in every district even treating districts as states. Yet another possibility, suggested by some commentators, is that subsection (d)'s reference to "contacts" in the case of multi-district states (which, before the 2011 amendment, appeared alongside the general corporate venue provision in subsection (c)) indicates that when Congress used the term "personal jurisdiction" in the general venue statute, it was thinking only of personal jurisdiction established through the traditional analysis of state long-arm statutes, not of jurisdiction obtained through special federal statutory provisions. See WRIGHT & MILLER § 3818; Rachel M. Janutis, *Pulling Venue Up by Its Own Bootstraps: The Relationship Among Nationwide Service of Process, Personal Jurisdiction, & § 1391(c)*, 78 ST. JOHN'S L. REV. 37, 38 (2004). Finally, we could read the additional complication introduced by subsection (d) as a signal not to decouple the clauses of Section 12 in the first place.

### III

Our sister circuits are split over how to read Section 12. Scholarly opinion is similarly divided. See WRIGHT & MILLER § 3818 (opining that the text of Section 12 indicates that the clauses should be read independently, but acknowledging that this creates odd results); Herbert Hovenkamp, *Personal Jurisdiction & Venue in Private Antitrust Actions in the Federal Courts: A Policy Analysis*, 67 IOWA L. REV. 485 (1982) (Section 12 best read as an integrated whole); Janutis, 78 ST. JOHN'S L. REV. 37 (reading Section 1391(c) to require a traditional personal jurisdiction analysis and not permitting reliance on Section 12's service-of-process provision); Jordan G. Lee,

Note, *Section 12 of the Clayton Act: When Can Worldwide Service of Process Allow Suit in Any District?*, 56 FLA. L. REV. 673 (2004) (arguing for allowing Section 12 personal jurisdiction to be combined with general venue); Adam B. Perry, Note, *Which Cases Are "Such Cases": Interpreting & Applying Section 12 of the Clayton Act*, 76 FORDHAM L. REV. 1177 (2007) (favoring a "hybrid" view).

The Third and Ninth Circuits hold that the Section's clauses may be decoupled, taking what might be termed the "independent" view of Section 12. The leading opinion on this side of the split is *Go-Video* from the Ninth Circuit. In that case, which involved a foreign corporation, the Ninth Circuit started from the premise that the plain text of Section 12 could not resolve the issue. 885 F.2d at 1408. Turning to other interpretive guides, the court found that "the manner in which courts have traditionally defined the relationship between one statute's specific venue provision and the general federal venue statutes," the legislative history and purpose of the Clayton Act, and precedent each pointed to the conclusion that Section 12's clauses need not be read as linked. *Id.*

The Ninth Circuit observed that *Pure Oil* and later cases instruct that special venue statutes generally supplement, rather than supplant, the general venue rules provided by Section 1391. *Id.* at 1409-10. The court took the position that this presumption of supplementation was in tension with the "integrated" view of Section 12, because, in its view, reading the clauses together renders Section 12 venue at least partially exclusive. *Id.* at 1408-09. Second, after reviewing Section 12's scant legislative history, the Ninth Circuit concluded that it provided no support for an integrated

reading of Section 12 and that, if anything, the fact that the service-of-process clause was appended to the venue provision only after the bill reached the Senate weakly suggested that Congress viewed the provisions as separate. *Id.* at 1410. The Ninth Circuit further noted that its reading of Section 12 was in keeping with the Clayton Act's general aim of expanding venue in antitrust actions, insofar as its view permitted venue in more districts than did the integrated view (indeed, it eliminated all limitations). *Id.* at 1410-11. Finally, the Ninth Circuit noted that of the handful of lower courts to confront the question, most had (as of that time) adopted the view that decoupling was permissible. *Id.* at 1411-12 (citing cases).

The Ninth Circuit acknowledged that decoupling the clauses of Section 12 potentially rendered Section 12's venue provision "wholly redundant," but it concluded that its view was nevertheless the preferable one. *Id.* at 1413. The Ninth Circuit later extended the holding in *Go-Video* to a suit against a domestic corporation in *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1177-80 (9th Cir. 2004). Persuaded by the reasoning of *Go-Video*, the Third Circuit also takes the position that a plaintiff may rely on nationwide service of process under Section 12 without also satisfying Section 12's venue provision, at least in the case of an alien corporation. *Auto. Refinishing Paint*, 358 F.3d at 296. (At least one district court in the Third Circuit has interpreted *Automotive Refinishing Paint* to apply exclusively in cases against alien corporations. See *Cumberland Truck Equip. Co. v. Detroit Diesel Corp.*, 401 F. Supp. 2d 415, 420-21 (E.D. Pa. 2005).)

On the other side of the split, the D.C. and Second Circuits have adopted the integrated view of Section 12. In *GTE New Media*, the D.C. Circuit based its reading of Section 12 on the statute's asserted "plain" language. 199 F.3d at 1350. In the D.C. Circuit's view, the term "in such cases" must refer back to the entire clause preceding the semicolon; to read the statute otherwise is effectively to "jettison the first clause" (a point with which the Ninth Circuit does not necessarily disagree). *Id.* at 1351. The court added: "it seems quite unreasonable to presume that Congress would intentionally craft a two-pronged provision with a superfluous first clause, ostensibly link the two provisions with the 'in such cases' language, but nonetheless fail to indicate clearly anywhere that it intended the first clause to be disposable." *Id.*

The Second Circuit also grounds its reading of Section 12 in the language of the statute. See *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 424 (2d Cir. 2005). The court reasoned that the common meaning of "such" is "having a quality already or just specified," or "previously characterized or described: aforementioned," and that the quality of the cases "just specified" in Section 12 is those that meet the venue provisions listed in the first clause, not antitrust cases against corporations in general. *Id.* (internal quotation marks omitted).

Having declared the meaning of Section 12 plain, the Second Circuit could have stopped there, as the D.C. Circuit did in *GTE New Media*. The court in *Daniel* went on, however, to list several additional factors supporting its view. Unlike the Ninth Circuit, the Second Circuit saw little in the legislative history to support the decoupling of Section 12's

two clauses. *Id.* at 425-26. It also pointed out that the Supreme Court has observed that "[i]n adopting § 12 Congress was not willing to give plaintiffs free rein to haul defendants hither and yon at their caprice," *United States v. Nat'l City Lines*, 334 U.S. 573, 588 (1948)—something that decoupling would surely allow. *Daniel*, 428 F.3d at 425. While the Second Circuit acknowledged that Congress intended to expand venue in enacting Section 12, it disagreed with the Ninth Circuit that this implied extending venue to the entirety of the United States. *Id.* at 425-26. In 1914, when the Clayton Act was enacted, the general venue provision was very narrow, as was the specific antitrust venue provision in the Sherman Act. Section 12 expands venue beyond either of those venue provisions as they existed at the time, and thus reading the section as a whole does not contradict Congress's intent in enacting Section 12. *Id.*

Finally, the Second Circuit saw little value in drawing analogies between Section 12 and other statutes containing special venue and service-of-process provisions, such as the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (Exchange Act), or the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1965 (RICO). For one thing, the Supreme Court has cautioned that "analysis of special venue provisions must be specific to the statute." *Cortez Byrd Chips, Inc. v. Bill Harbert Constr. Co.*, 529 U.S. 193, 204 (2000). More importantly, the structure and wording of statutes such as the Exchange Act or RICO are different from that of Section 12. *Daniel*, 428 F.3d at 426. RICO, for instance, separates its venue and service-of-process provisions into distinct, non-sequential lettered subdivisions. *Id.* Indeed, given that the Clayton Act was apparently the model for RICO, the court in

*Daniel* reasoned that, if anything, the different wording and structure of RICO's venue and service-of-process provisions reinforced the conclusion that the clauses in Section 12 are linked. *Id.* at 427.

So that is where the circuit split stands. This case calls on our court to enter the fray. While we acknowledge that this question does not admit of a clear or easy resolution, for the reasons that follow we join the Second and D.C. Circuits in holding that Section 12's venue and service-of-process provisions must be read together.

**IV**

In matters of statutory interpretation, we begin with the text. As the Supreme Court has instructed time and again, if "the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case," then that meaning controls and the court's "inquiry must cease." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997); see also *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992); *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240-41 (1989). The Second and D.C. Circuits each took the position that the text alone conclusively established that the two clauses of Section 12 are linked together, reasoning that the phrase "in such cases" could refer only to cases where venue was proper under the first clause. See *Daniel*, 428 F.3d at 424; *GTE New Media*, 199 F.3d at 1350. We are less confident that the text alone drives this result.

Though we agree with the Second Circuit that "such" means "'having a quality already or just specified'; 'of this or that character, quality, or extent: of the sort or degree previously indicated or implied'; or 'previously

characterized or described: aforementioned,'" *Daniel*, 428 F.3d at 424 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (UNABRIDGED) 2283 (1986)), the question remains: what is the "quality" of the cases specified in the first clause? A thing's "quality" includes its particular characteristics, typically signaled by adjectives, and so we can be confident that "such cases" must, at a minimum, refer to antitrust cases brought against corporations. But the venue provision in clause one of Section 12 is not phrased in adjectival terms. Rather, the clause speaks of antitrust cases against corporations and provides that they "may be brought" in certain districts; it does not speak of antitrust cases against corporations that "are brought" in those districts. Given that Section 12's venue provision is not plainly structured as a characteristic of the cases described, it is not apparent that these provisions specify the "quality" of the cases referred to in clause two. See WRIGHT & MILLER § 3818 ("The [Second Circuit's] conclusion rests on the assumption that 'such cases' refers to antitrust cases against corporations that *are* brought in the approved venues, but that is not a possible referent of 'such cases' because those words nowhere appear in the clause preceding the semi-colon.") (emphasis in original).

The difficulties posed by the Second and D.C. Circuits' reading of the text do not, however, convince us that the contrary reading is correct. Reading the two clauses of Section 12 independently creates textual problems of its own. If the clauses are not linked, then the venue language is superfluous. Interpretations that render words of a statute superfluous are disfavored as a general matter, *e.g.*, *Astoria Fed'l Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991), and this principle has even greater force in a context such as

this, where, in order to decouple Section 12's venue and service-of-process provisions, we would have to assume that Congress intentionally joined the two provisions with a semicolon, but nevertheless intended for the second provision to render the first "disposable," *GTE New Media*, 199 F.3d at 1351. Accord *Go-Video*, 885 F.2d at 1413 (recognizing that this interpretation of Section 12 had the potential to render the venue provision "wholly redundant").

Even setting aside problems of surplusage, the independent reading of Section 12 leads to some very odd results. *Cf. Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). As noted earlier, allowing antitrust plaintiffs to mix and match Section 12's service-of-process provision with Section 1391's general venue provision renders the venue inquiry meaningless, since venue is satisfied in every federal judicial district under subsection (c)(2). This runs contrary to Congress's apparent intent in passing Sections 12 and 1391 that there be *some* limits on venue, in antitrust cases specifically and in general. Both statutes authorize venue only when certain enumerated requirements are met, be it that the defendant "transacts business" in the district, "resides" there, or something else. It would be quite strange to read two statutes that place limits on venue in a manner that eliminates those limits.

Then there is the matter of Section 1391(d). If we were to adopt the de-linked view of Section 12 and allow it to be combined with general corporate venue, we run into the fact

that subsection (d) injects a minimum-contacts test that would otherwise be absent into the venue analysis, but only in cases brought in states with multiple judicial districts. As discussed above, there are various ways to deal with sub-section (d), but the most sensible one is to view it as yet another signal that the clauses of Section 12 should be read as an integrated whole. If a plaintiff cannot pair Section 12 service of process with Section 1391 venue, then the plaintiff will have to show that the defendant has sufficient minimum contacts with the forum under both subsections (c)(2) and (d). This eliminates the possibility of selectively *re*introducing the minimum-contacts analysis based on the happenstance of whether the state has multiple judicial districts.

If something in Section 12 compelled the mix-and-match approach, then that is what we would follow. But we see nothing in the text, purpose, or history of Section 12 that casts doubt on the result we have reached. We are not persuaded to the contrary by the Ninth Circuit's reasoning in *Go-Video*. Although it is true that courts generally read special venue statutes as supplementing, rather than supplanting, general venue, *Go-Video*, 885 F.2d at 1409, that principle is beside the point. No plaintiff is required to use Section 12 if she finds it preferable to use Section 1391 and the general state long-arm statute (or some other source of personal jurisdiction and service). See *Daniel*, 428 F.3d at 427. Section 12 provides an additional option, but one that requires use of the service and venue rules as a package.

Second, the fact that Congress passed Section 12 with the intent to expand venue in antitrust cases does not indicate that Congress wanted *nationwide* venue. Congress said no

such thing in Section 12. To the contrary, it created specific limits on venue—limits that for many corporations would result in a set of permissible districts much smaller than the entire United States. *Nat'l City Lines*, 334 U.S. at 588 ("In adopting § 12 Congress was not willing to give plaintiffs free rein to haul defendants hither and yon at their caprice."). Section 12 venue is broader than venue under either the Sherman Act or the general venue statute as it existed in 1914, and we think that this is all that Congress intended. Finally, we agree with the Second Circuit that Section 12's sparse legislative history is, at best, inconclusive and an insufficient basis for overlooking the confusing and strange implications of decoupling the clauses. *Daniel*, 428 F.3d at 425-26.

In sum, while we find the language of Section 12 too ambiguous to rely on the "plain meaning" rationale endorsed by the Second and D.C. Circuits, the practical effects of decoupling the clauses of Section 12 are ultimately too bizarre and contrary to Congress's apparent intent for us to endorse. Thus, we hold that Section 12 must be read as a package deal. To avail oneself of the privilege of nationwide service of process, a plaintiff must satisfy the venue provisions of Section 12's first clause. If she wishes to establish venue exclusively through Section 1391, she must establish personal jurisdiction some other way.

## V

We may now turn at last to the case before us. First, we consider whether personal jurisdiction and venue are satisfied under Section 12. Personal jurisdiction is easy: due process requires only that GTT have sufficient minimum contacts with the United States as a whole to support

personal jurisdiction, and Congress has provided for nationwide service of process. See *Action Embroidery*, 368 F.3d at 1180. As a domestic corporation, GTT has sufficient minimum contacts with the United States to satisfy due process, and there is nothing unreasonable about requiring the company to submit itself to the authority of the federal courts.

Venue under Section 12 is another matter. Although the section provides for venue in any district where a defendant is an inhabitant, is found, or transacts business, only the last and most expansive of these tests is relevant here. See *United States v. Scophony Corp. of Am.*, 333 U.S. 795, 807 (1948) ("transacts business" is a broader concept than being "found"). The Supreme Court interprets the phrase "transacts business" as "the practical, everyday business or commercial concept of doing business or carrying on business of any substantial character." *Id.* (internal quotation marks omitted); see also *Tiger Trash v. Browning-Ferris Indus., Inc.*, 560 F.2d 818, 824 (7th Cir. 1977). In the case of a defendant that manufactures and sells goods, such as GTT, the Court has found that a defendant transacted business for purposes of Section 12 in a district when it promoted its goods through product demonstrations, solicited orders through salespersons located in the district, and shipped its products to the district. *Eastman Kodak Co. v. S. Photo Materials Co.*, 273 U.S. 359, 374 (1927). Lower courts have also found that a defendant was transacting business in a district when the defendant maintained offices and provided customer assistance in the district, *Banana Distribs., Inc. v. United Fruit Co.*, 269 F.2d 790, 794 & n.8 (2d Cir. 1959); when it made substantial purchases in the district, *Black v. Acme Mkts., Inc.*, 564 F.2d 681, 687 (5th Cir. 1977); and when it

exercised extensive control over a subsidiary or distributor that transacted business in the district, *Chrysler Corp. v. Gen. Motors Corp.*, 589 F. Supp. 1182, 1200 (D.D.C. 1984); *Grappone, Inc. v. Subaru of Am., Inc.*, 403 F. Supp. 123, 130-31 (D.N.H. 1975).

GTT's activities in the Southern District of Illinois fall so far short of those examples that they must be characterized as *de minimis* for purposes of the transacting-business inquiry. Approximately 71 GTT traffic signal interrupters are installed at various intersections throughout the district, which covers approximately 16,500 square miles. See *Illinois Counties Ranked by Area*, ILL. STATE GEOLOGICAL SURVEY, http://isgs.illinois.edu/education/hi-low/arearank.shtml (last visited August 1, 2013); see also 28 U.S.C. § 93(c) (Illinois counties within Southern District of Illinois). Without knowing how many intersections there are in the Southern District of Illinois, or how many intersections are or might be eligible to be installed with traffic signal interrupters, we cannot say what percentage this represents, but 71 traffic intersections is a drop in the bucket. The fact that GTT's technology is being used in a few places within the district does not demonstrate that it transacts business there. With minor exceptions, GTT did not make sales in the district (the technology is selected through a public procurement process that occurred in Springfield, which is located in the Central District of Illinois, 28 U.S.C. § 93(b)) nor did GTT install the units that made their way to the district. GTT did make six direct sales to locations in the district over a four-year period, for a grand total of $2,327.25, or .002% of GTT's total sales in this period. While sales volume is not dispositive in a Section 12 venue analysis, see, *e.g.*, *Green v. U.S. Chewing Gum Mfg. Co.*, 224 F.2d 369, 372 (5th Cir. 1955); *ABC Great*

*States, Inc. v. Globe Ticket Co.*, 310 F. Supp. 739, 742 (N.D. Ill. 1970), GTT's negligible sales in the district provide only the weakest support for venue.

Beyond the presence of GTT technology and minimal in-district sales, the district court found, and KME does not dispute, that GTT has no offices or employees in the district, that GTT equipment (apart from its direct sales) is purchased from and installed by third-party distributors whom GTT does not control, and that GTT does not send agents into the district for purposes of maintaining the equipment or providing other customer service. GTT does not "do[] business or carry[] on business of any substantial character," *Scophony*, 333 U.S. at 807, in the district, and venue is not proper under Section 12.

Before deciding that venue is lacking, we should also ask whether Section 1391 can be satisfied. This option is available only if KME can establish that personal jurisdiction in the state of Illinois is proper under Illinois's long-arm statute. We need not engage in that analysis, however, because we conclude that venue is improper even if personal jurisdiction is present. We look first to Section 1391(b)(1), which provides for venue in the district in which the defendants reside. As explained earlier, in cases brought in states with multiple judicial districts (such as Illinois), a corporation resides in any district in which it would be subject to personal jurisdiction were that district a state. 28 U.S.C. § 1391(c)(2) & (d). Thus, for purposes of evaluating venue, we must consider whether GTT would be subject to personal jurisdiction in the Southern District of Illinois.

Illinois's long-arm statute permits its courts to exercise personal jurisdiction to the fullest extent allowed by the

Illinois and U.S. Constitutions. 735 ILCS § 5/2-209(c). Under the Illinois Constitution, personal jurisdiction is proper "only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997) (quoting *Rollins v. Ellwood*, 565 N.E.2d 1302, 1316 (Ill. 1990)). The U.S. Constitution requires that GTT have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316 (internal quotation marks omitted). These tests are not necessarily co-extensive, but to the extent they diverge, the Illinois constitutional standard is likely more restrictive than its federal counterpart. See *Rollins*, 565 N.E.2d at 1316 ("The Illinois Constitution contains its own guarantee of due process to all persons (Ill. Const. 1970, art. I, § 2), a guarantee which stands separate and independent from the Federal guarantee of due process … . [T]he final conclusions on how the due process guarantee of the Illinois Constitution should be construed are for [the Illinois Supreme Court] to draw."). If GTT may not be subjected to personal jurisdiction in the Southern District of Illinois under federal constitutional standards, then we need not worry whether jurisdiction is also proper under the Illinois Constitution.

Turning to federal due process requirements, personal jurisdiction may be either general or specific. See, *e.g.*, *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2853-54 (2011). Specific jurisdiction requires that the plaintiff's cause of action relate to the defendant's contacts

with the forum, *id.* at 2853, and it is plainly inapplicable here. KME's claims center on a patent infringement lawsuit in Minnesota and alleged bid-rigging in states other than Illinois. They have nothing to do with GTT's six sales in southern Illinois, nor do they relate to the GTT technology that has been installed within the district. Indeed, the technology at the center of KME and GTT's ongoing, multi-front legal battle—the dual optical-GPS interrupter unit—is not even present in the district.

General jurisdiction is similarly a nonstarter. It requires "continuous and systematic general business contacts" with the forum, *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 416 (1984), such that the defendant is "essentially at home" there, *Goodyear*, 131 S. Ct. at 2851. See also *Abelesz v. OTP Bank*, 692 F.3d 638, 654 (7th Cir. 2012) (pointing out that this standard is difficult to meet). GTT's minimal contacts with the Southern District of Illinois, described above, fall well short of the sort of systematic and continuous presence that would suffice for general personal jurisdiction. Accordingly, we conclude that there is no personal jurisdiction over GTT in the Southern District of Illinois, and thus venue is not proper under subsections (c)(2) and (d) of Section 1391. (We note that KME has failed to show, in the alternative, that venue is proper under Section 1391(b)(3). This fallback provision applies only when venue is not otherwise proper in any district, and KME does not suggest that there is no other venue in which this suit may be brought.)

As a last resort, KME argues that venue in the Southern District is proper based on a theory of waiver. It contends (correctly, though the district court did not acknowledge it)

that GTT, LLC conceded that it was subject to personal juris-
diction in the state of Illinois. In KME's view, this concession
provides a basis for venue as to the LLC; it then argues that
GTT, Inc. is also subject to jurisdiction and venue in the dis-
trict because of its parent-subsidiary relationship with the
LLC.

There are two difficulties with this theory. First, while the
LLC conceded personal jurisdiction with respect to Illinois
as a whole, it actively contested venue in the Southern
District, arguing that while its contacts with the state
supported the exercise of jurisdiction, its contacts with the
*district* were too minimal to support venue under Section
1391(d). We see nothing inconsistent in this approach.
Section 1391(d) requires analysis of a defendant's contacts
with the specific district; if these are insufficient, then venue
is not proper, regardless of the defendant's contacts
elsewhere in the state. By conceding personal jurisdiction as
to the state, the LLC did not automatically waive its
objections to venue in the Southern District.

Second, even if we were to conclude that the LLC had
waived venue, we would not trace this waiver to GTT, Inc.
The activities of a subsidiary may suffice to assert
jurisdiction over the parent if there is some basis for piercing
the corporate veil, such as the parent's unusual degree of
control over the subsidiary, but this does not apply in the
case of an ordinary parent-subsidiary relationship that
observes corporate formalities. See *Cent. States, Se. & Sw.
Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d
934, 943 (7th Cir. 2000); see also *Tiger Trash*, 560 F.2d at 823
(acknowledging that the parent's control of its subsidiary
must be more extensive than the typical parent-subsidiary

relationship to support the exercise of venue over the parent based on the activities of the subsidiary). Here, nothing about the relationship between GTT, Inc. and GTT, LLC suggests an abnormal level of involvement or control by the parent that would allow us to exercise jurisdiction over the parent solely on the basis of the activities of its subsidiary.

Venue is not proper under either Section 12 or Section 1391, and the district court therefore properly dismissed the suit. Because we affirm on venue grounds, we need not address GTT's multiple alternative arguments supporting the district court's judgment.

## VI

Before concluding, we must address GTT's outstanding motion to seal or return to the district court several documents in the appellate record. Specifically, GTT asks us to seal district court document 65, which is an unredacted version of KME's response to GTT's motion to dismiss that contains customer and pricing data. It also asks us to return district court documents 75, 75-6, and 75-9 to the district court. Document 75 is KME's unredacted response to an order to show cause why it should not be held in contempt for violating the district court's previous orders to keep documents under seal, and it contains customer and pricing information similar to that in document 65. Document 75-6 is an exact copy of another document that this court has already ordered sealed, and document 75-9 contains additional pricing information. GTT asks that the documents be sealed or returned to protect sensitive, confidential pricing and customer information. GTT additionally points out that document 75 and its exhibits relate exclusively to

the pending contempt proceedings against KME and thus are unnecessary to our resolution of this appeal.

This court does not look favorably on indiscriminate, reflexive motions to seal the appellate record, but narrow, specific requests will be granted when based on articulated, reasonable concerns for confidentiality. See *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 546-47 (7th Cir. 2002). Further, returning documents to the district court is appropriate when they are not among "the materials that formed the basis of the parties' dispute and the district court's resolution." *Id.* at 547. GTT's request is narrow, specific, and justified, and we will therefore grant the motion in full.

In summary, we AFFIRM the district court's dismissal for improper venue, and we GRANT GTT's motion to seal document 65 and to return documents 75, 75-6, and 75-9 to the district court.